IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| QUANTLAB FINANCIAL, LLC, and QUANTLAB GROUP, L.P., | § § § | |
| Plaintiffs, | § | |
| | § | Case No. _____ |
| v. | § § | |
| DAVID REYNOLDS, | § § | |
| Defendant. | § § | |

## PLAINTIFFS' VERIFIED COMPLAINT AND APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiffs Quantlab Financial, LLC, and Quantlab Group, L.P., file this Verified Complaint and Application for Preliminary and Permanent Injunctive Relief against Defendant David Reynolds ("Reynolds").

## I.    SUMMARY

This suit is to prevent imminent irreparable harm to Quantlab Financial, LLC, Quantlab Group, L.P., and their Affiliates (collectively, "Quantlab") based upon Reynolds's—former Chief Technology Officer of Quantlab—breach and threatened breach of his contractual and legal duties to Quantlab, and to resolve related disputes between Reynolds and Quantlab. Reynolds has entered into multiple contractual agreements with Quantlab, wherein he has agreed to be bound by various restrictive covenants, including a recently renegotiated one-year non-competition restriction and a two-year non-solicitation restriction. Despite agreeing to be bound by such restrictions, Reynolds has decided to put his obligations to the wayside by participating in the solicitation of Quantlab employees to leave their employment and work for his current employer, Citadel, a direct

competitor of Quantlab. Although Quantlab agreed to limit Reynolds's original two-year non-competition restriction to one year, such agreement was conditioned on Reynolds's reaffirmation of his other restrictive covenants, including his non-solicitation restriction. Because Reynolds has been participating in the solicitation of Quantlab employees in material breach of the parties' agreement, Quantlab is released from its promise to limit Reynolds's non-competition restriction to one year. This makes Reynolds's non-competition restriction enforceable for its entire two-year period and Reynolds's continued employment with Citadel a probable violation of his obligations to Quantlab.

Accordingly, Quantlab seeks to enjoin Reynolds from violating his restrictive covenants in order to prevent causing imminent irreparable harm to its business and goodwill. Quantlab further seeks declaratory relief to determine its rights under its Agreements with Reynolds, as well as damages associated with Reynolds's unlawful conduct, which has forced it to seek judicial intervention to enforce its rights.

## II.  PARTIES

1.     Quantlab Financial, LLC, is a limited liability company, duly formed and existing under the laws of the State of Delaware. Quantlab Financial, LLC, is a wholly owned subsidiary of Quantlab Group, L.P., a limited partnership, also duly formed and existing under the laws of the State of Delaware. Quantlab Financial, LLC, and Quantlab Group, L.P.'s principal place of business is located in Houston, Harris County, Texas.

2.     Upon information and belief Defendant Reynolds is an individual who purportedly lives in, and is a citizen of, Chicago, Illinois. Reynolds may be served with process at his residence in Illinois, or his recently professed location of employment at Citadel Securities LLC (together with its affiliates, referred to as "Citadel"), 131 South Dearborn Street, Chicago, Illinois.

## III. JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, described herein, including damages and Quantlab's attorneys' fees, exceeds $75,000, exclusive of interest and costs.

4. This Court has personal jurisdiction over Reynolds by virtue of his contractual consent and waiver of any and all objections to the contrary contained in the parties' Loyalty Agreement, which is one of the agreements at issue in this lawsuit. See Ex. A, § 6(c). The contractual consent is binding and fully sufficient standing alone. *See Atlantic Marine Construction Company, Inc. v. United States District Court for the Western District of Texas,* 571 U.S. 49, 134 S.Ct. 568 (2013); *see also National Equipment Rental, Ltd. v. Szukhent,* 375 U.S. 311, 315, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964) ("[P]arties to a contract may agree in advance to the jurisdiction of a given court, to permit notice to be served by the opposing party, or even to waive notice altogether.")

5. Venue is proper in this district[1] because it is the chosen venue under the forum selection clause (Section 6(c)) of the Loyalty Agreement, which clearly states, "Houston, Texas, shall be the exclusive place of proper venue for any legal proceeding involving a claim arising from [the] Agreement." See Ex. A, § 6(c); *see also Atlantic Marine Constr. Co.,* 134 S. Ct. at 582 ("When parties agree to a forum-selection clause, they waive the right to challenge the preselected

[1] In accordance with Section 65.023 of the Texas Civil Practice and Remedies Code, which makes venue in lawsuits seeking injunctive relief against a Texas resident mandatory in the county in which the defendant is domiciled, Quantlab initially filed this lawsuit in Texas state court in Polk County, which is the county of Reynolds's last known address. In response, Reynolds filed a notice of removal, wherein he represented that he is a resident and citizen of Illinois, effectively removing that lawsuit to the Eastern District of Texas. In light of these representations, the mandatory venue provision of the Texas Civil Practice and Remedies Code does not apply, as Reynolds is purportedly no longer a Texas resident. As such, Quantlab filed a notice of voluntary dismissal in that lawsuit and filed the instant lawsuit in this district, which is the proper venue pursuant to the contractual forum selection clause contained in the Loyalty Agreement.

forum as inconvenient or less convenient for themselves or their witnesses or for their pursuit of the litigation.").

6.     Venue is also proper in the Southern District of Texas pursuant to 28 U.S.C. § 1391(2), because a substantial part of the events giving rise to the cause of action occurred in Harris County, Texas. Specifically, the actions complained of herein arise out of employment and contractual relationships formed in Harris County, Texas, and solicitation events involving individual employees of Quantlab employed in Harris County, Texas.

## IV.    FACTS

### A.    Plaintiff Quantlab

7.     Quantlab is a highly successful quantitative financial research firm that employs a team of Ph.D. scientists and other professionals to develop and maintain proprietary trading systems used on financial markets by affiliated financial companies around the world.  Quantlab's proprietary trading system consists of a combination of technology and strategy.  Quantlab's success has been driven by its tremendous investment of time, effort, and money to internally develop profitable proprietary trading *strategies* and the valuable *technology* used to implement those strategies.  The *strategies* and *technology* were not developed by any one individual but, rather, are the result of years of collaboration among and between teams of talented people that include many Ph.D. and Master's level scientists and computer programmers.  The secrecy, exclusive possession, and exclusive use of this intellectual property is critical to the continued success of Quantlab.

8.     The technology consists of low latency data transmission and computer processing, highly efficient transaction processing and order execution, portfolio risk management, and other operational systems and techniques (collectively referred to as the "*technology*") that are used to

implement the trading strategies. The trading strategies use advanced mathematical and statistical modeling to identify and take advantage of market inefficiencies and other opportunities for trading profits (collectively referred to as the "*strategy*").

9.     Quantlab's proprietary trading systems (meaning both *technology* and *strategy*) are applied across a wide spectrum of financial instruments and markets, and are utilized in the automated trading of financial instruments world-wide. The systems rely upon real-time market data, high speed computing based upon proprietary trading strategies, and low latency connections to the world's electronic exchanges/trading venues. Both the system and the strategies provide Quantlab an advantage in the marketplace, and would be valuable to any competitor operating an automated trading system.

10.     Automated trading is a highly competitive industry where success is dependent on intellectual property and trade secrets. It is a business where small incremental improvements in the trading technology or strategy can create significant competitive advantages. Quantlab has devoted substantial resources (many years and millions of dollars) developing its trading *technology* and *strategies*, and employs an in-house team of highly educated and experienced individuals to develop and continually refine its trading systems. With the exception of very general descriptions of Quantlab's trading systems like those provided in this Complaint, information regarding Quantlab's trading systems is kept confidential and is not generally known by Quantlab's competitors. This provides Quantlab with a competitive advantage over others who do not have anything more than very general information regarding Quantlab's trading systems, much less the level of detailed information an employee in a sensitive position within Quantlab would have.

11.     Quantlab takes reasonable steps to guard the secrecy of the trading *strategies* and trading *technology*, as well as the research that informs the components of each. These steps include, but are not limited to: making it a condition of employment that all employees with access to the *strategies* or *technology* execute written proprietary information agreements, password-protecting sensitive files and drives on Quantlab's computer systems, limiting which employees and managers may access certain files relating to the *strategies* and *technology*, and limiting and monitoring office access through high-tech security techniques.

12.     Quantlab employs these and other measures to protect and prevent the disclosure of the confidential and proprietary information because disclosure would cause that information to become less valuable and would harm the value of the *strategies* and *technology*. If this confidential and proprietary information were to fall into the hands of a competitor or other persons familiar with the industry, those persons could use and/or modify the proprietary methods to identify and capture the same valuable trading opportunities currently identified by Quantlab and usurp these opportunities, resulting in lost profits. In other words, Quantlab's competitors would effectively be able to use and profit from the fruit of Quantlab's labor (and directly take profits from Quantlab) without incurring any of the risks, losses, and expenses associated with the investment of time and money to develop Quantlab's confidential and proprietary information, trading *strategies*, and trading *technology*.

**B.     Reynolds's Employment with Quantlab**

13.     Dr. Reynolds, a Ph.D. Mathematician, was employed at Quantlab for almost *two decades*, from August 1999 through August 2017, the majority of which was spent as Quantlab's Chief Technology Officer (CTO). This is a highly-compensated, senior management position of unusual significance and exposure to Quantlab's technology.

14.     As Quantlab's CTO, Reynolds was placed in a position of special trust and confidence where he has been provided with Quantlab's confidential information and trade secrets and paid to learn and improve upon Quantlab's proprietary trading systems.

15.     In the course of his employment at Quantlab, Reynolds was entrusted with important trade secrets and Confidential Information (as defined in the Agreements) of Quantlab. This included, but is not limited to, working with Quantlab's trade secrets and Confidential Information related to Quantlab's trading *technology*. Reynolds has received exposure to a wide spectrum of Quantlab's trading *technology*, including but not limited to those that involve trading strategies with trading frequencies ranging from nanoseconds to daily, on multiple asset classes and financial instruments. Moreover, in his role as CTO, Reynolds was deeply familiar with the technology pipeline for future developments across the entire spectrum of Quantlab's trading *technology*.

16.     Reynolds reported functionally to high-level management in Houston, including but not limited to Quantlab's Chief Scientist who was responsible for developing and maintaining Quantlab's trading *strategy*. In his role as CTO, Reynolds supervised employees and technology development in multiple Affiliates, and regularly participated in top-level management meetings that involved discussions of some of Quantlab's most sensitive Confidential Information and trade secrets.

C.     **The Loyalty Agreement**

17.     On October 26, 2011, in connection with his employment, Reynolds and Quantlab[2] entered into the Employee Loyalty, Confidentiality, Inventions, Non-Solicitation, and Non-Competition Agreement ("Loyalty Agreement"). Ex. A. Under the Loyalty Agreement, Quantlab

---

[2] As clearly indicated in Section 3(e) therein, Quantlab Group, LP, was an intended third party beneficiary of the Loyalty Agreement.

agreed to disclose and grant Reynolds access to confidential information. *Id.* In exchange, Reynolds agreed to be bound by certain restrictive covenants, including but not limited to non-disclosure, non-competition, non-solicitation, and non-hire restrictions. *Id.*

18.  In particular, with respect to non-disclosure, the Loyalty Agreement provides as follows:

> *(f)    RESTRICTION ON USE.  Employee shall use Confidential Information and Proprietary Information only for the benefit of Employer and as authorized to carry out his or her responsibilities to Employer. Employee agrees that Employee will not, at any time during or after Employee's employment with the Company, make any unauthorized use or disclosure of any Confidential Information or Proprietary Information, or make any use thereof at all, except in the course and scope of Employee's employment with the Company and as necessary and authorized for the carrying out of Employee's employment and responsibilities. Following termination, Employee shall neither directly nor indirectly, use or disclose any Confidential Information or Proprietary Information, except as expressly and specifically authorized in writing by Employer.*

*See id.* at ¶3(f).

19.  With respect to non-competition, the Loyalty Agreement states that:

> *(c)    LIMITATIONS ON WORK FOR COMPETITORS. For a period of two (2) years following termination of employment with the Company, Employee shall not without prior written permission from Employer:*
>
> > *(i)    directly or indirectly perform for, render advice to, or otherwise assist a Competitor in any position, job, task, function, or responsibility that is substantially similar to the positions, jobs, tasks, functions, or material responsibilities that Employee performed on behalf of the Company at any time during the final two (2) years of employment with the Company, or direct, supervise, or manage any such position, job, task, function, or responsibility; or*
>
> > *(ii)    directly or indirectly (including as a consultant or independent contractor) accept employment with a Competitor in a position, or render consulting services to a Competitor relating to such subjects, that Confidential Information to which Employee had access during the Period of Employment would likely assist the Competitor.*

*See id.* at ¶4(c).

20.     With respect to non-solicitation and non-hire, the Loyalty Agreement states that:

> *(f)    NON-HIRE CLAUSE. For a period of two (2) years following termination of employment with the Company, Employee will not directly or indirectly, employ or participate in inducing or causing to be employed persons who were employees or service providers (e.g., consultants or independent contractors) of Employer or any Affiliate at any time during the two (2) years immediately preceding the termination of the Period of Employment.*

*See id.* at ¶4(f).

21.     Reynolds specifically agreed that the resulting or imminent damage to Quantlab's business or goodwill, as a result of any breach or threatened breach, "would be irreparable and extremely difficult to estimate, making any remedy at law or in damages inadequate." *Id.* at ¶4(g).

22.     To that end, the importance of preventing a breach before it occurs because of the likelihood of irreparable harm was emphasized in the Loyalty Agreement. In fact, Reynolds specifically agreed that Quantlab would "be entitled to injunctive relief against [him] in the event of any breach or threatened breach of [the Loyalty Agreement]" by him, including the following:

> *(i) injunctive relief by temporary restraining order, temporary injunction, and/or permanent injunction, (ii) recovery of the attorney's fees and costs incurred by the Company in obtaining such relief, and (iii) any other legal and equitable relief to which it may be entitled, including any and all monetary damages which the Company may incur as a result of said breach or threatened breach.*

*Id.* The parties further agreed that the bond for obtaining such injunctive relief would be $1,000.00. *Id.*

23.     In addition, in the event Reynolds failed to comply, the Loyalty Agreement provided for tolling and equitable extensions of Reynolds's restrictions. *Id.* at ¶4(h). Specifically, in the event Reynolds violates his restrictions, Reynolds agreed to extend the time period for such restriction:

...by the **greater** of one (1) day for each day that the parties are in litigation over the restriction, up to a maximum of two (2) years, or one (1) day for each day [Reynolds] is found to have violated the restriction, up to a maximum of two (2) years.

*Id.* (emphasis in original).

### D.    Letter Agreement and Vesting and Participation Agreement

24.    While the discussion and prospect of Reynolds's employment ending began earlier, Reynolds's last day of employment with Quantlab was August 10, 2017; however, Reynolds remained eligible to participate in Quantlab's employee equity incentive programs through October of 2017, and, consistent with the release he signed, he was provided his final paycheck inclusive of paid time off on August 31, 2017. Furthermore, Reynolds remained eligible to participate in Quantlab's employee incentive programs through October of 2017. The fact that Reynolds was well aware of the extension of his employment through August of 2017 is evident from his posted LinkedIn work history description, which describes his employment with Quantlab as being August 1999 through August 2017 (18 years).  Ex. E.

25.    Incident to  the conclusion of his employment, Quantlab presented Reynolds with a letter agreement dated September 28, 2017 ("Letter Agreement"), by which, in exchange for Reynolds's affirmation and agreement that his restrictive covenants under the Loyalty Agreement were reasonable and enforceable, Quantlab agreed to limit his non-competition restriction to one year (rather than the two-year period provided thereunder). Ex. B (Letter Agreement). Importantly, the Letter Agreement explicitly excluded the Loyalty Agreement's non-disclosure, non-solicitation, and non-hire restrictions from such limitation. *Id.* As such, those restrictions remained in full force and effect for the entire two-year period.

26.    Reynolds executed the Letter Agreement on October 13, 2017. *Id.* On that same day, Reynolds and Quantlab entered into the Vesting and Participation Agreement ("Vesting and

Participation Agreement"). Under the Vesting and Participation Agreement, Quantlab awarded Reynolds a 75.0018% membership interest ("Membership Interest") in Quantlab Incentive Partners IV, LLC. Ex. C (Vesting and Participation Agreement).

27.     Vesting of Reynolds's Membership Interest, however, was made subject to myriad of enumerated vesting conditions under paragraph 6 of the Vesting and Participation Agreement, each of which were expressly stated to be "an integral part of the consideration" for Reynolds's Membership Interest. *Id.* at ¶6. Among these vesting conditions was Reynolds's agreement not to, directly or indirectly, solicit or hire any current or former employees of Quantlab for twenty-four (24) months following the end of his employment. *Id.* at ¶6(d). Specifically, the Vesting and Participation Agreement, states that:

> d)     <u>Non-Solicitation, Non-Interference and Non-Disparagement</u> – *During, and for twenty-four (24) months following, the end of Employment of the Participant by either the Employer or a Successor Employer (collectively the "Company") such Participant will not, directly or indirectly, in any manner solicit any of the employees or independent contractors of the Company to leave their Employment with the Company, or hire any such employee who was employed by the Company as of the date of such individual's termination or who left Employment with the Company within one year prior to or after the date of such individual's termination.*

*See id.* at ¶6(d).

28.     In the event Reynolds failed to comply with the Vesting and Participation Agreement's vesting conditions, including its non-solicitation restriction, Reynolds's Membership Interest would never vest. *See id.* at ¶6(j) ("In order for the Participant to commence to vest in the [Membership Interest]…the Participant shall not otherwise be in violation of any of the provisions of this Agreement.").

29.     Similar to the Loyalty Agreement, the Vesting Participation Agreement also provides for injunctive relief in the event of a breach or threatened breach:

> *...the Company shall be entitled (i) injunctive relief by temporary restraining order, temporary injunction, and/or permanent injunction, (ii) recovery of the attorney's fees and costs incurred by the Company in obtaining such relief, and (iii) any other legal and equitable relief to which it may be entitled, including any and all monetary damages which the Company may incur as a result of said breach or threatened breach. Injunctive relief shall not be the exclusive relief and may be in addition to any other relief to which the Company would otherwise be entitled. One Thousand Dollars ($1,000.00) is the agreed amount for the bond to be posted if an injunction is sought by the Company.*

*Id.* at ¶6(k).

### E. Reynolds Competes with Quantlab and Violates Non-Solicitation

30. Despite agreeing to be bound by the terms of the Loyalty Agreement and Vesting and Participation Agreement, including the restrictive covenants contained therein, and despite further reaffirming such restrictions by means of the Letter Agreement, Plaintiffs have reason to believe Reynolds has engaged in conduct that violates such obligations.

31. Upon information and belief, in or around December 2018, Reynolds began working for Citadel as the company's Head of Systematic Trading Technology. According to his LinkedIn profile, in that role, Reynolds is "[r]esponsible for real-time trading platforms and low-latency software development." Ex. E. These are some of the same responsibilities Reynolds held with Quantlab. While his employment with Citadel did not initially appear to violate his non-competition restriction (as limited to one-year by agreement), Reynolds's violations of his non-solicitation restrictions, as discussed below, renders that limitation null and void, bringing Reynolds's employment into violation.

32. To illustrate, in July of 2019, at least three current employees of Quantlab received a solicitation on LinkedIn from a recruiter. Ex. D. It appears clear to Quantlab from the wording in some of these solicitations that this solicitation effort was on behalf of and at the direction of Reynolds, whose LinkedIn profile was linked therein and for whom the recruiter stated she was

"doing some work for…." *Id.* In fact, the *entire* solicitation effort appears to be centered around Reynolds and his experience at Quantlab and the fact that the recruiter was pursuing candidates on behalf of Reynolds. *Id.*

33.     In addition, earlier this year, Reynolds's replacement CTO at Quantlab, Demian Kosofsky ("Kosofsky"), resigned from his employment and disclosed that he intended to accept a position with Citadel after his non-competition agreement expired. At the time, it was only suspected that Reynolds was involved in Kosofsky's recruitment; however, in light of the evidence described above regarding how Citadel's recruitment efforts are being pursued, Quantlab believes that Reynolds's involvement is implicated with respect to Kosofsky as well.  Quantlab has also learned of three other former Quantlab employees – both with ties to Reynolds - who are in current discussions with Citadel regarding potential employment.

34.     Based on the foregoing, Quantlab has good reason to believe that Reynolds's conduct is in violation of his non-solicitation restrictions. And, as a result, Reynolds has materially breached the Letter Agreement, releasing Quantlab from its promise to limit Reynolds's non-competition restriction to one year.

35.     The damage to Quantlab created by Reynold's violation of the restrictions referred to above is irreparable in nature; it cannot be fully measured or remedied.  When inside information about Quantlab employees and their capabilities are shared with a competitor to facilitate recruiting, the value of the confidentiality of that information is irreparably damaged.  It cannot be un-learned by the competitor.  And, the loss of a valuable employee is irreparable.  For example, when a valuable employee is lost due in whole or in part to prohibited solicitation activity, Quantlab cannot compel the individual to return to work for Quantlab and the court cannot compel the individual to do so.  The future contributions of the employee (an item of indeterminable value)

are forever lost. These are only a few examples of how the damage done through a violation cause irreparable harm.

36. The irreparable harm is imminent. As the LinkedIn solicitation reflects, the solicitation activities being undertaken for Reynold's are ongoing. Given the way solicitation activities of this nature are conducted, there is no way for Quantlab to know the full extent and frequency of the recruiting activities. The fact that several employees or former employees indicated that they were talking to or going to Citadel before the most recent LinkedIn solicitation was discovered indicates that efforts to recruit Quantlab current and former personnel are not isolated but are instead part of an ongoing recruitment campaign targeting certain Quantlab employees based upon information provided to Citadel by Reynolds.

## V. CAUSES OF ACTION

### A. Declaratory Judgment

37. All the preceding paragraphs are incorporated herein by reference.

38. Quantlab seeks a declaratory judgments pursuant to 28 U.S.C. § 2201. Quantlab incorporates by reference the facts alleged above.

39. Quantlab seeks a declaratory judgment that:

    a.    the restrictive covenants contained in the Loyalty Agreement and the Vesting and Participation Agreement, and incorporated into the Letter Agreement (collectively, the "Agreements") are enforceable

    b.    that the post-employment restrictions provided for therein are enforceable against Reynolds.

    c.    Reynolds materially breached the Letter Agreement;

    d.    Reynolds has breached the Vesting and Participation Agreement;

    e.    Quantlab is discharged and excused from its obligations and promises under the Letter Agreement, including its promise to reduce the period of its enforcement of the two-year non-competition provision in the Loyalty Agreement to one year; and

   f.  the time period for any restriction contained in the Loyalty Agreement and/or the Vesting and Participation Agreement that Reynolds is found to have violated is tolled and extended by the greater of one day for each day that the parties are engaged in litigation over such restriction, or one day for each day Reynolds is found to have violated the restriction.

40.  Alternatively, pursuant to TEX. BUS. & COM. CODE §15.51(c), in the unlikely event that the Agreements are not enforceable as written, Quantlab requests that the Court reform the Agreements as necessary to protect Quantlab's legitimate business interests and enforce it.

### B.  Breach of Contract - Loyalty Agreement

41.  All the preceding paragraphs are incorporated herein by reference.

42.  All conditions precedent necessary for the enforcement of the Loyalty Agreement have been satisfied.

43.  Quantlab acted in reliance upon the promises Reynolds made in the Loyalty Agreement.

44.  Quantlab performed its obligations in the Loyalty Agreement. However, by and through his actions, Reynolds has breached his contractual obligations in the Loyalty Agreement. By, directly or indirectly, soliciting current and/or former employees of Quantlab, Reynolds has violated his restrictive covenants set forth in the Loyalty Agreement. Further, because, as discussed below, Reynolds materially breached the Letter Agreement, Quantlab is discharged and released from its obligations and promises thereunder, including its agreement to limit Reynolds's non-competition restriction in the Loyalty Agreement to one year. In light of this, Reynolds's non-competition restriction is enforceable for its entire two-year period. Reynolds's employment with Citadel, therefore, which began less than two-years following his resignation from Quantlab, is also a violation of his restrictions contained in the Loyalty Agreement.

45.  As a direct and proximate result of Reynolds's breaches of the Loyalty Agreement, Quantlab has suffered actual damages and is entitled to monetary damages against Reynolds.

**C. Breach of Contract - Vesting and Participation Agreement**

46. All the preceding paragraphs are incorporated herein by reference.

47. All conditions precedent necessary for the enforcement of the Vesting and Participation Agreement have been satisfied.

48. Quantlab acted in reliance upon the promises Reynolds made in the Vesting and Participation Agreement.

49. Quantlab performed its obligations in the Vesting and Participation Agreement. However, by and through his actions, Reynolds has breached his contractual obligations in the Vesting and Participation Agreement. By, directly or indirectly, soliciting current and/or former employees of Quantlab, Reynolds has violated his restrictive covenants set forth in the Vesting and Participation Agreement.

50. As a direct and proximate result of Reynolds's breaches of the Vesting and Participation Agreement, Quantlab has suffered actual damages and is entitled to monetary damages against Reynolds.

**D. Breach of Contract - Letter Agreement**

51. All the preceding paragraphs are incorporated herein by reference.

52. All conditions precedent necessary for the enforcement of the Letter Agreement have been satisfied.

53. Quantlab acted in reliance upon the promises Reynolds made in the Letter Agreement.

54. Quantlab performed its obligations in the Letter Agreement. However, by and through his actions, Reynolds has breached the Letter Agreement. By, directly or indirectly, soliciting current and/or former employees of Quantlab, Reynolds has violated his restrictive

covenants set forth in the Loyalty Agreement. In violating such covenants, Reynolds has, thereby, materially breached the Letter Agreement, where under he affirmed and agreed to the reasonableness and enforceability of his restrictive covenants in the Loyalty Agreement. As a result of this material breach, Quantlab is discharged and released from its obligations and promises under the Letter Agreement, including its agreement to limit Reynolds's non-competition restriction in the Loyalty Agreement to one year. In light of this, Reynolds's non-competition restriction is enforceable for its entire two-year period. As a direct and proximate result of Reynolds's breaches of the Letter Agreement, Quantlab has suffered actual damages and is entitled to monetary damages against Reynolds.

## VI. INJUNCTIVE RELIEF

55. All preceding paragraphs are incorporated by reference and made a part hereof.

56. The nature of the harm caused by a violation of the Agreements, or a threatened violation of the Agreements, is ongoing and irreparable in nature. It is also imminent in nature under the circumstances described above. There is a substantial likelihood of success on the merits of Quantlab's claims in this lawsuit, and the need for the injunctive relief outlined below outweighs any harm to Reynolds or the public.

57. In order to prevent imminent and irreparable harm, Quantlab requests that an order of specific performance be issued requiring Reynolds to comply with the terms of the Agreements, and that preliminary and permanent injunctions be issued restraining and enjoining Reynolds, and anyone acting in concert with him, from directly or indirectly:

    (a)    performing for, rendering advice to, or otherwise assisting a Competitor in any position, job, task, function, or responsibility that is substantially similar to the positions, jobs, tasks, functions, or material responsibilities that Reynolds performed on behalf of Quantlab at any time during the final two (2) years of employment with Quantlab, or directing, supervising, or managing any such position, job, task, function, or responsibility;

(b)     accepting employment (including as a consultant or independent contractor) with a Competitor in a position, or rendering consulting services to a Competitor relating to such subjects, that Confidential Information to which Reynolds had access during the his employment with Quantlab would likely assist the Competitor;

(c)     call on, service, solicit, or accept, on behalf of a Competitor, competing business from customers of Quantlab or its Affiliates (i) with which Reynolds had or made contact, or (ii) about which Reynolds had access to Confidential Information, if such contact or access to Confidential Information occurred during the final two years of employment with Quantlab;

(d)     employing or participating in inducing or causing to be employed persons who were employees or service providers (*e.g.*, consultants or independent contractors) of Quantlab or any Affiliate at any time during the two (2) years immediately preceding Reynolds's separation of employment with Quantlab;

(e)     interfering with Quantlab's business relationships with its employees and other service providers (*e.g.*, consultants or independent contractors) by directly or indirectly, soliciting, inducing, or encouraging any such persons to terminate an existing business relationship with Quantlab or any Affiliate, or helping another person or entity engage in any such acts of interference; and

(f)     using or disclosing any of Quantlab's Confidential Information.

58.     For purposes of the injunctive relief sought herein, the following terms are defined as follows:

(a)     "Affiliate" shall mean any person or entity that directly or indirectly controls, is controlled by, or is under common control with Quantlab, including but not limited to Quantlab Capital Management, LLC, QCM Cayman, Ltd., Quantlab US, Ltd., and Quantlab Securities LP. In addition, the term shall also be deemed to include the following without regard to control: Quantlab Group, LP, Quantlab Holdings, LLC, Quantlab Technologies Ltd., Quantlab Trading Partners, LP, Quantlab Trading Partners US, LP, Quantlab Trading Partners Offshore, Ltd., Q1 Partners, LP, Q1 Partners US, LP and Q1 Offshore Partners, Ltd. and all of their related companies, predecessors, successors, and assigns and any new entities that may be created by any Affiliate in the future;

(b)     "Confidential Information" is defined as and shall include, without limitation, trade secrets and/or other information that has been developed or used and/or will be developed or used by or for the benefit, or at the expense, of Quantlab or its Affiliates that cannot be readily obtained through proper means by third parties from outside sources, in whatever for, tangible or intangible, pertaining to the

business of Quantlab or ay Affiliate, or their employees, investors, clients, consultants, or business associates;

(c) "Competitor" is defined as and shall include all other entities that engage in FMMRDO that (1) research, develop, operate, own or intend to research, develop, operate or own (2) automated trading systems (3) that trade or intend to trade (a) on the same electronic market centers and (b) at the same frequencies or materially similar frequencies (4) that Quantlab either traded, was trading, was evaluating trading or was planning to trade during the final two years of Reynolds's employment with Quantlab;

(d) "FMMRDO" means and refers to researching, developing, operating or owning fully-automated trading strategies, models, modeling technology, operational programs, platforms, software, and/or algorithms, which are used for fully-automated trading on equity, bond, options, foreign exchange and futures markets around the world, or as may be modified, improved or expanded during Reynolds's employment with Quantlab;

(e) "The same frequencies" refers primarily to high-frequency, which means and refers to strategies that more often than not result in buying and selling the same security on the same day; and

(f) "Materially similar frequencies" means and refers to frequencies that may be higher or lower than those to which Quantlab's models or strategies are currently applied but to which Quantlab's trading models or strategies could be profitably (even if not optimally) applied.

## V. ALTERNATIVE REFORMATION AND EXTENSION OF TIME PERIOD

59. All preceding paragraphs are incorporated by reference and made a part hereof.

60. In the alternative, and in the event that the Court should find any part of the restrictions in the Agreements to be too broad to be enforced as written, or otherwise unenforceable, Quantlab requests that said restrictions be enforced to such lesser extent as is reasonable and enforceable for purposes of injunctive relief to prevent irreparable harm and, if necessary, reformed by the Court so as to make the restrictions enforceable to the maximum extent allowed by law pursuant to the Court's equitable powers and TEX. BUS. & COM. CODE § 15.51(c).

61. As to the time frame of the restrictions imposed by the Agreements, Quantlab requests that the Court apply the tolling provision provided for in Section 4(h) of the Loyalty

Agreement and/or use its equitable powers to extend the time period for any restriction that Reynolds is found to have violated by the greater of: (a) one day for each day that the parties are engaged in litigation over such restriction, or (b) one day for each day Reynolds is found to have violated the restriction.

## VI.    ATTORNEYS' FEES

62.    Quantlab has been forced to retain the undersigned attorneys in connection with this matter. Quantlab has agreed to pay the undersigned attorneys a reasonable fee for their services. Quantlab asks that this Court award Quantlab its reasonable attorneys' fees and other costs, as provided for under Sections 38.001 of the Texas Civil Practices and Remedies Code, as well as Section 11(j) of the Vesting and Participation Agreement and Section 6(g) of the Loyalty Agreement.

## VII.    PRAYER FOR RELIEF

63.    WHEREFORE, PREMISES CONSIDERED, Quantlab prays that Reynolds be commanded to appear and answer and that Quantlab have and recover the following:

a.    Upon hearing, an order of specific performance and preliminary injunction restraining and enjoining Reynolds and his agents, servants, employees, attorneys and all other persons or entities in active concert or participation with him who receives actual notice of the order by personal service or otherwise as described in Paragraphs 57 (a) – (f) above;

b.    Upon final trial, a permanent injunction restraining and enjoining Reynolds and his agents, servants, employees, attorneys and all other persons or entities in active concert or participation with him who receive actual notice of the order by personal service or otherwise as described in Paragraphs 57 (a) – (f) above;

c.    All actual damages (direct and consequential) suffered by Quantlab, an amount which is in excess of the minimum jurisdictional limit of the Court;

e.    Attorneys' fees and expenses incurred in prosecuting this action;

f.    Costs of suit, pre-judgment and post-judgment interest in the maximum amounts allowed by law;

g.     Alternatively, reformation in accordance with Paragraphs 40 and 60 above; and,

h.     Any and all other relief Quantlab may show itself entitled to in law or equity.

Dated: September 26, 2019

Respectfully submitted,

*/s/ M. Scott McDonald*

M. Scott McDonald
Texas Bar No. 13555505
M. Collin Quigley
Texas Bar No. 24100928
Littler Mendelson, P.C.
2001 Ross Avenue, Suite 1500
Dallas, TX 75201
214.880.8107 (Telephone)
214.880.0181 (Facsimile)
smcdonald@littler.com
cquigley@littler.com

Of Counsel:
Simon J. Garfield
Texas Bar No. 24040957
Fran R. Shuman
Texas Bar No. 24050202

Quantlab Financial, LLC
3 Greenway Plaza, Suite 200
Houston, Texas 77046
713.400.5917 (Telephone)
713.400.5918 (Facsimile)
sgarfield@quantlab.com
fshuman@quantlab.com

Allan H. Neighbors, IV
State Bar No. 24033660
Littler Mendelson, P.C.
1301 McKinney, Suite 1900
Houston, Texas 77010
713.951.9400 (Telephone)
713.951.9212 (Facsimile)
aneighbors@littler.com

ATTORNEYS FOR PLAINTIFFS
QUANTLAB FINANCIAL, LLC, AND
QUANTLAB GROUP, L.P.

4832-8591-9911.1 038021.1043

STATE OF TEXAS                           §
                                         §
                                         §
COUNTY OF HARRIS                         §

## VERIFICATION

Before me, the undersigned Notary Public, on this day personally appeared Tim McInturf who, after being duly sworn, stated under oath that he is employed as the President of Quantlab Financial, LLC; that he has read *Plaintiffs' Verified Complaint and Application for Preliminary and Permanent Injunctive Relief* (hereinafter "Plaintiffs' Complaint"); that he is authorized to serve as the corporate representative of Quantlab Financial, LLC ("Company") and in that capacity provides this affidavit and verifies that the Company has personal knowledge (through personal knowledge of Affiant, business records, and/or information acquired through corporate representatives) that the statements of fact made in ¶¶ 7 - 36 of Plaintiffs' Complaint are true and correct.

_____
Tim McInturf
President
Quantlab Financial, LLC

Subscribed and sworn to before me on this the 26th day of September 2019.

HOLLY MORAN
My Notary ID # 129652071
Expires December 16, 2021

_____
Notary Public

4832-8591-9911.1 038021.1043