# EXHIBIT C

# VESTING AND PARTICIPATION AGREEMENT

This Vesting and Participation Agreement (this "**Agreement**") is entered into this 13th day of October , 2017, by and between the Quantlab Group, LP, a Delaware limited partnership ("**QG**"), Quantlab Financial, LLC, a Delaware limited liability company ("**QLF**") and David Reynolds ("**Participant**").

## RECITALS

WHEREAS, QG is currently the owner of 100% of the equity interests in the following subsidiary companies, namely: QLF and its wholly owned subsidiaries (collectively the "**QLF Companies**"); Quantlab Technologies, Ltd ("**QLT**") and its wholly owned subsidiary entities (collectively the "**QLT Companies**"); Quantlab Trading Partners LP ("**QTP**") and its wholly owned subsidiary entities (collectively the "**QTP Companies**"); QTPM Holdings LP ("**QTPM**") and its wholly owned subsidiary entities (collectively the "**QTPM Companies**"); Q1 Partners LP ("**Q1**") and its wholly owned subsidiary entities (collectively the "**Q1 Companies**"); Resonant Partners, LP ("**Resonant**"); and Natasha Management, LLC ("**Natasha**"). Collectively QLG and the QLF Companies, the QLT Companies, the QTP Companies, the QTPM Companies, the Q1 Companies, Resonant and Natasha shall herein be referred to as the "**QG Companies**".

WHEREAS, Quantlab Incentive Partners I, LLC, a Delaware limited liability company ("**QIP1**"), is an entity that holds a Class B limited partnership interest in QG (the "**QIP1 LP Interest**") which entitles QIP1 and its members to share in a portion of the operating profits (the "**Operating Profit Interest**") and the capital appreciation (the "**Capital Appreciation Rights**") in QG ;

WHEREAS, the Participant had been a member of QIP1, and incident thereto such Participant had entered into one or more Vesting and Participation Agreements (collectively, the "**QIP1 Agreement**") which defined the Participant's duties and obligations incident to his vesting and participation in QIP1;

WHEREAS, the Participant surrendered all interest in QIP1 and was assigned a 31.6474% Class B Percentage Interest in QG (the "**QG Interest**") pursuant to the Assignment Agreement, dated October 13, 2017, which interest contained both an Operating Profit Interest and Capital Appreciation Rights;

WHEREAS, QG and the Participant entered into a Supplement Agreement to Letter Agreement Relating to Rights in Quantlab Incentive Partners I, LLC, dated October 13, 2017, wherein the Operating Profit Interest attached to the QG Interest was extinguished and terminated;

WHEREAS, on October 13, 2017, Participant's remaining QG Interest was transferred to Quantlab Incentive Partners IV, LLC, a Delaware limited liability company ("**QIP4**"), and all of the Participant's rights and interest in and to the Capital Appreciation Rights formerly held in QG was likewise transferred into QIP4;

WHEREAS, QG and QLF desire that Participant be admitted as a Member in QIP4 which will allow the Participant to share in the Capital Appreciation Rights as set forth in the QIP4 operating agreement (the "**QIP4 Interest**");

WHEREAS, Participant has been an employee of QLF and in such capacity has received and/or been privy to Confidential Information of the QG Companies or any of the other affiliated companies as such terms are defined herein; and

WHEREAS, subject to the terms, conditions and limitations set forth in this Agreement, the Participant is being given the QIP4 Interest set forth above.

## AGREEMENT

NOW THEREFORE, for good and valuable consideration, the receipt and adequacy of which is herein acknowledged, the parties agree as follows:

1) <u>Defined Terms</u> – To the extent that terms are referred to in this Agreement beginning in capital letters then, unless such terms are specifically defined in this Agreement, their meaning shall be the same as the equivalent defined terms in the QIP 4 operating agreement as set forth in the attached Exhibit A (the "**Operating Agreement**").

2) <u>Admission into QIP4</u> – Subject to the express terms and conditions set forth herein, the Participant shall, effective on October 13, 2017, be admitted as a Member in QIP4 and shall be granted a 75.0018% Membership Interest in QIP4 (the "**Participant QIP4 Interest**").

3) <u>Capital Contribution</u> – No Capital Contribution shall be required of the Participant over and above any initial Capital Contribution made by the Participant incident to his initial admission as a Member of QIP4.

4) <u>QIP4 Operating Agreement</u> – The Participant, and if applicable, the Participant's spouse, shall, as of the Effective Date, execute the signature page for the QIP4 Operating Agreement.

5) <u>Effective Date</u> – The Effective Date of this Agreement shall be on the latter of the first date set forth above or if later the date on which the Participant (and if required the Participant's spouse) executes the signature page of the QIP4 Operating Agreement.

6) <u>Vesting</u> - As an incentive to QG to allow the Participant to receive the Participant QIP4 Interest, from and after the Effective Date, the Participant's Participant QIP4 Interest shall be subject to the following vesting conditions which are an integral part of the consideration being received by QG for allowing the Participant to share in such economic rights in QG:

a) <u>Definitions</u> – the following definitions shall apply to this Section 6 and, as applicable, to the other provisions of this Agreement:

    1) <u>Employer</u> – shall mean any or all of the QG Companies and shall further include any other affiliated companies to QG including but not limited to Quantlab Securities LP ("**QLS**") and Quantlab UK, Ltd. ("**QUK**") (collectively the "**Quantlab Affiliated Companies**") to the extent that the Participant is or was an employee of any such other company(ies) or otherwise did work for any such company(ies). Furthermore, solely for purposes of this Agreement, to the extent that this Agreement is made with a person who is an independent contractor rather than an employee, then, solely for purposes of applying the provisions of this Agreement, but not for any other purpose, any reference in this Agreement to "employee" shall also include the independent contractor and any reference to Employment or Employer shall refer to the contractual arrangement for services between such independent contractor and the company within the Quantlab Affiliated Companies that such independent contractor provides the services to.

    2) <u>Employed or Employment</u> – shall mean, as to an employee, the fact that such employee is or was an employee of the Employer. Furthermore, as applicable to periods after the date of a Capital Event for purposes of this Agreement, employment shall mean that the employee or independent contractor, as the case may be, is or was an employee of a Successor Employer (as such term is herein defined).

    3) <u>Capital Event</u> - shall mean any event at the QG level which will give rise to a distribution to QIP4 from QG that is attributable to the LP Class B Interest as such term is defined in the QIP4 Operating Agreement, provided that if any such distribution from QG to QIP4 is not in complete redemption of QIP4's Class B Limited Partnership Interest in QG then as to the remaining portion of the LP Class B Interest in QG retained by QIP4 this provision shall remain in effect with respect to any future Capital Event that occurs wherein additional proceeds are distributed by QG to QIP4 which are deemed attributable to the remaining LP Class B Interest, it being the intent herein that multiple Capital Events may be possible and each such separate Capital Event shall be treated as such for purposes of this Agreement.

    4) <u>Confidential Information</u> - For purposes of this Agreement the term "Confidential Information" means and includes all information and any idea in whatever form, tangible or intangible, pertaining to the business of Employer or its Affiliates, that is not

generally known outside the Employer or Affiliate's organization or so known only through improper means. For purposes of this Agreement, "Affiliate" shall mean any person or entity that directly or indirectly controls, is controlled by, or is under common control with Employer including but not limited to the QG Companies and the Quantlab Affiliated Companies, Resonant Partners, LP, Quantlab Technologies, Ltd, the Quantlab Group, LP, Quantlab Financial, LLC, Quantlab Capital Management, Ltd., Quantlab Capital Management, LLC, QCM Cayman, Ltd., Quantlab Argos, LLC, Quantlab Futures Technology, Inc., Quantlab Futures Infrastructure, LLC, and Quantlab Europe B.V.. In addition, the term Affiliate also includes, without limitation, Quantlab Securities, LP, Quantlab Trading Partners, LP, Capital Technologies, Inc., Quantlab Trading Partners, US, LP, Quantlab Trading Partners Offshore, Ltd., Q1 Partners, LP, Q1 US, LP and Q1 Offshore Feeder, Ltd., Q1 Offshore Partners, Ltd., QTPM Limited, a Maltese Corporation, QTM Holdings LP, Q1M Limited, a Maltese Corporation, Q1M Holdings LP, Q1E, LP, Q2 Partners, LP, Quantlab GmbH, a German corporation, Quantlab UK, a British limited company, Aragorn Management, LLC and all of their related companies, predecessors, successors, and assigns and any new entities that may be created by any of the foregoing entities in the future which are given access to any such Confidential Information. Without limiting the foregoing definitions, Confidential Information shall include, but not be limited to: (i) formulas, teaching and development techniques, processes, trade secrets, computer programs, electronic codes, inventions, improvements, and research projects; (ii) information about specific investments, costs, profits, markets, sales, and lists of investors, customers or clients; (iii) business, marketing and strategic plans; and (iv) employee personnel files and compensation information. Confidential Information also includes: (1) tick-data based indicators, mathematical approaches, computational algorithms, and parameter settings used to obtain short-term price prediction; (2) indicators and algorithm used for longer-term price prediction overlay on top of day-trading strategy, as well as approaches used to combine the overlay with the faster strategy within the same portfolio; (3) market microstructure modeling based on representation of time-delayed correlations and cross-correlations; (4) algorithms and approaches used to generate indicators based on limit-order book information and combination of different books coming from different trading venues; (5) specific assumptions and approximations for estimating the expected return for a given order and simulating order execution; (6) techniques for automatic factor detection using correlation/covariance matrices derived from intraday data; (7) metrics used for performance analysis and real-time-monitoring of individual sub-strategies,

including "unbiased slippage" and the concept of average time-dependent return from entering the trade as the primary criterion in making trading decisions; (8) specific portfolio optimization methodology used in running the strategy, including the way the trading decisions are derived from expected returns and biases are applied to the expected returns in order to satisfy various constraints; (9) specific design, logic, and software architecture used for fitting microstructure models, generating price predictions, translating price predictions into trading decisions, trading strategy back-testing, performance monitoring and analysis; (10) computer software or data of any sort developed (in the case of software) or compiled (in the case of data) by Employer or an Affiliate: (11) the fact that Employer or an Affiliate uses, has used, or has evaluated for potential use a particular computer program or system, if the disclosure of such fact to a competitor of Employer might reasonably be expected to adversely affect the competitive position of Employer or an Affiliate relative to that of such a competitor; (12) computational algorithms, procedures, methods, or techniques, or the essential ideas and principles underlying such algorithms, procedures, methods, or techniques, developed by Employer or an Affiliate (but excluding any public domain algorithm, procedure, or technique), whether or not such algorithms, procedures, methods, or techniques are embodied in a computer program; (13) the fact that Employer or an Affiliate uses, has used, or has evaluated for potential use any particular computational algorithm, procedure, or technique developed by a party other than Employer or an Affiliate, whether or not such algorithm, procedure, or technique is embodied in a computer program, if the disclosure of such information to a competitor of Employer or an Affiliate might reasonably be expected to adversely affect the competitive position of Employer or an Affiliate relative to that of such a competitor; (14) trading strategies and order execution techniques developed, investigated, evaluated, or employed by Employer or an Affiliate, or any information that might reasonably be expected to lead to the development of such strategies, whether or not such information is embodied in a computer program; (15) information related to any market inefficiencies or anomalies, statistical price relationships or patterns, or phenomena related to the execution of orders discovered, investigated, measured, or exploited by Employer or an Affiliate, whether or not such information is embodied in a computer program; (16) the results of any analysis conducted by Employer or an Affiliate for its own internal use (and not approved for dissemination to its customers, investors, consultants, joint ventures, or other parties) through either the execution of actual or simulated trading experiments or the execution of computational studies involving historical data, including but not limited to price

and economic data; (17) information regarding the rate of return, variability of return, or other statistical measures associated with any trading strategy developed, investigated, evaluated, or employed by Employer or an Affiliate, or any other information regarding the performance of such a strategy; (18) information related to the trading volume, capital deployment, or transaction costs associated with any of Employer's trading strategies, or with Employer or an Affiliate's trading in the aggregate; (19) any information that would typically be included in Employer or an Affiliate's income statements, including, but not limited to the amount of Employer or an Affiliate's revenues, expenses, or net income; (20) information regarding the classes of financial instruments traded on a proprietary (non-customer) basis by Employer or an Affiliate or studied by Employer or an Affiliate as candidates for such trading, or the classes of financial instruments known or believed by the Participant as a result of his activities in the course of and through his Employment with the company to offer the potential for profitable investment, trading, or market making activities; (21) strategies, practices, or techniques for market-making, agency trading, order crossing, or customer execution developed or engaged in by Employer or an Affiliate, if the disclosure of such information to a competitor of Employer might reasonably be expected to adversely affect the competitive position of Employer or an Affiliate relative to that of such a competitor; (22) any other information gained in the course of the Participant's Employment with the company that could reasonably be expected to prove deleterious to Employer or an Affiliate if disclosed to third parties, including without limitation any information that could reasonably be expected to aid a competitor of Employer or an Affiliate in making inferences regarding the nature of Employer or an affiliate's proprietary trading activities, where such inferences could reasonably be expected to adversely affect the competitive position of Employer or an Affiliate relative to that of such a competitor; (23) any other information gained in the course of or incident to the Participant's Employment with the Company that Employer or an Affiliate has received from a third party and is required to hold confidential in connection with an agreement between Employer or an Affiliate and such third party; and (24) any other information gained in the course of or incident to the Participant's Employment with the company that Employer or an Affiliate treats or designates as Confidential Information and which is not publicly available.

5)    Successor Employer – means, in the event of Capital Events as described in Section 6(a)(3) above, any new or existing entity set up by the acquirer (or by any subsidiary or parent thereof) of QG or

its assets or of the Employer or the Employer's assets as the case may be to hold the business of the Employer after the Capital Event.

b)   <u>Continued Employment Not Required</u> – Subject to the provisions of Section 8 below and further subject to the provisions of paragraph (h) below, Participant may commence to vest in the Participant QIP4 Interest regardless of whether the Participant is Employed by the Employer on the date on which a Capital Event (with respect to the portion of the LP Class B Interest held by QIP4 that is allocable to the specific Capital Event) occurs.

c)   <u>No Disclosure of Confidential Information</u> – Except as authorized by Employer and in connection with his or her Employment by Employer, the Participant agrees not to disclose, disseminate or otherwise use or allow any person to use or otherwise have access to any Confidential Information of Employer or any affiliate or client of Employer. Furthermore, if Participant is a party to any separate confidentiality, non-disclosure, non-solicitation, or non-competition agreement with Employer then, in addition to the requirements set forth above, to the extent that such agreement contains any additional and or more restrictive confidentiality and or non-disclosure requirements and or conditions then compliance with the terms of such agreement, in addition to this agreement shall be a condition of this Agreement.

d)   <u>Non-Solicitation, Non-Interference and Non-Disparagement</u> – During, and for twenty-four (24) months following, the end of Employment of the Participant by either the Employer or a Successor Employer (collectively the "Company") such Participant will not, directly or indirectly, in any manner solicit any of the employees or independent contractors of the Company to leave their Employment with the Company, or hire any such employee who was employed by the Company as of the date of such individual's termination or who left Employment with the Company within one year prior to or after the date of such individual's termination. In addition, during and for twenty-four (24) months following the end of Employment of the Participant with the Company such Participant will not, directly or indirectly, in any manner solicit the business of any client or prospective client of the Company with whom the Participant, employees reporting to the Participant, or anyone whom the Participant has or had direct or indirect responsibility over had personal contact or dealings on the Company's behalf during the three-year period immediately preceding such Participant's termination. Such Participant is also prohibited from disparaging the Company in any way.

e)   <u>Non-Competition during the term of Employment</u> - During the term of Employment the Participant will not, directly or indirectly:

1)      Engage in any business activity in which the Employer or the Successor Employer operates, including any competitive business;

2)      Render any services to any competitive business; or

3)      Acquire a financial interest in or become actively involved with any competitive business (other than as a passive investor holding minimal percentages of the stock of public companies).

**"Competitive business"** means any business that competes, during the time that the Participant is Employed (including Employment after the date of the Capital Event and continuing until the date set forth in Section 6(f) below), with the business of the Company (including any activities that the Company are actively considering conducting during such period of Employment, so long as such Participant knows or reasonably should have known about such plans) upon any market or exchange upon which the research or trading systems of the Company or any of their Affiliates are used and shall specifically includes any investment fund, hedge fund, proprietary trading fund or other such entity that undertakes trading or investing activities upon a common exchange or market as those activities undertaken by the trading funds that are affiliated with the Company. By way of example only, all companies operating in the domain of Financial Market Microstructure Research, Development and Operations whose research or operations are used on a common market with those markets upon which Employer's research or operations are used are competitive businesses, whether they may be using microstructure models for proprietary trading their own account (includes Hedge fund, Investment Banks, Broker Dealers, International and Domestic Banks, Trading Firms), for driving, on a predictive basis, list execution business within a Broker Dealer, or for some other purpose. This would include firms in the execution domain and brokerage firms.

f)      <u>Non-Competition following the term of Employment</u> - Participant agrees that for a period of 12 months after termination of Employment, he or she shall not, without prior written permission from the Company, directly or indirectly, (i) engage in Financial Market Microstructure Research, Development and Operations on behalf of a competitive business; or (ii) become employed by a competitive business operating in the domain of Financial Market Microstructure Research, Development and Operations. Participant understands that the foregoing restrictions may limit Participant's ability to engage in certain activities during the Non-Competition period but acknowledges that these restrictions are reasonable and necessary to protect the Confidential Information that the Company or its Affiliates has provided to Participant, and the value of the goodwill and ultimately the value of the ownership interests of Employer's owners, and the ownership interests transferred (or to be transferred) to subsequent

owners or Successor Employers. Participant further acknowledges that the Confidential Information, described above, and all future developments, represents the core asset of the Company and its Affiliates, which must be protected through strong non-disclosure and non-competition agreements.

g) <u>Non-Disclosure of this Agreement</u> – Except to the extent otherwise required by law, neither the Participant nor his or her spouse shall, without the prior written consent of QG, which consent can be withheld at the discretion of QG, disclose, discuss with or otherwise share with any other person including but not limited to other employees (either current or former) of the QG Companies and or other members of QIP4 or any similar entity set up by QG that is similar to QIP4 in providing income and or capital appreciation sharing rights to employees or contractors of any QG Companies (collectively the "**QIP Affiliates**"), (i) the terms or other provisions of this Agreement, (2) the terms or other provisions contained in the QIP4 Operating Agreement, (iii) any information provided to the Participant by the QG Companies or agents or Affiliates of the QG Companies regarding either QG or QIP4 relating to the value of their QIP4 Interest and or QIP4's Interest in QG. Notwithstanding the foregoing, the Participant shall have the right to show this Agreement and the QIP4 Operating Agreement and any related information to his or her legal counsel as needed to allow the Participant to be properly advised of his or her rights duties and obligations vis a vis this Agreement and the QIP4 Operating Agreement.

h) <u>Vesting After Capital Event</u> – In the event a Capital Event occurs then the following vesting rules shall apply to the Membership Interest in QIP4 held by the Participant:

1) On the date of the Capital Event, with respect to the portion of the Class B LP Interest held by QIP4 that is applicable to such Capital Event (the "**Applicable Portion**"), to the extent that the Participant has not violated the non-disclosure of confidential information conditions set forth in clause (c) above or the various conditions set forth in clauses (d) through (g) above, the Participant shall vest as to 100% of the Applicable Portion of their QIP4 Interest.

Once a Participant vests in a portion of the Participant's QIP4 Interest, the Participant shall receive a written certification stating the fact that they have vested in the specified portion of the QIP4 Interest as provided for in this Agreement within thirty (30) days following the date upon which such vesting occurs.

i) [Reserved]

j)    <u>Violation of this Agreement</u> – In order for the Participant to commence to vest in the QIP4 Interest and further subject to the provisions of paragraph (h) above, as of the date of any specific Capital Event the Participant shall not otherwise be in violation of any of the provisions of this Agreement.

k)    <u>Notice to Future Employer/Violation of Conditions</u> - Participant will advise any future employer of the foregoing restrictions before accepting new employment. In the event of breach or threatened breach by the Participant of any provision of paragraphs (c), (d), (e) or (f) of this Section 6, the Company shall be entitled to (i) injunctive relief by temporary restraining order, temporary injunction, and/or permanent injunction, (ii) recovery of the attorney's fees and costs incurred by the Company in obtaining such relief, and (iii) any other legal and equitable relief to which it may be entitled, including any and all monetary damages which the Company may incur as a result of said breach or threatened breach. Injunctive relief shall not be the exclusive relief and may be in addition to any other relief to which the Company would otherwise be entitled. One Thousand Dollars ($1,000.00) is the agreed amount for the bond to be posted if an injunction is sought by the Company. Each restriction set forth in paragraph (c), (d), (e) or (f) of this Section 6 shall survive the termination of Participant's Employment with the Company. The existence of any cause of action by Participant against the Company shall not constitute a defense to enforcement of the restrictions on Participant created by this Agreement. If Participant fails to comply with a timed restriction contained in paragraphs (c), (d), (e) or (f) of this Section 6, the time period for that will be extended by one day for each day Participant is found to have violated the restriction, up to a maximum of twenty-four (24) months. If any court or arbiter should find any of the restrictions on Participant in this Agreement unenforceable as written, it shall revise same to make it enforceable to protect the Company's interests to the maximum extent legally allowed.

7)    <u>Transferability of QIP4 Interest</u> – The Participant shall not Transfer (other than a transfer occurring as a result of the death of the Participant), Encumber or otherwise dispose of his or her unvested QIP4 Interest without the prior written consent of QG, which consent may be withheld by QG at its sole and absolute discretion. Any transfer or attempted transfer of any such unvested QIP4 Interest shall be an event of default under this Agreement and shall thereupon result in the immediate forfeiture of any remaining unvested QIP4 Interest. In addition to the foregoing any transfer or attempted transfer of the Participant's vested QIP4 Interest shall be subject to the transferability restrictions contained in the QIP4 Operating Agreement.

8)    <u>No Contractual Right of Employment</u> – Unless the Employer and Participant have entered into a written agreement to the contrary, any Employment relationship is at-will—meaning, among other things, that either Participant or Company may terminate any such relationship at any time, for any reason, with or without cause.

Notwithstanding anything contained in this Agreement to the contrary, nothing contained in this Agreement is intended to nor shall it create any right, guarantee, duty or other obligation on behalf of the Company to retain the Participant as an employee or independent contractor of the Company.

9) <u>NO GUARANTEE OF VALUE</u> – NOTHING CONTAINED IN THIS AGREEMENT SHALL BE CONSTRUED TO GUARANTEE OR OTHERWISE ASSURE THE PARTICIPANT THAT THE MEMBERSHIP INTEREST RECEIVED IN QIP4 WILL HAVE ANY VALUE IN THE FUTURE. IN ACQUIRING THE MEMBERSHIP INTEREST IN QIP4 THE MEMBER UNDERSTANDS AND AGREES THAT, AS OF THE EFFECTIVE DATE HEREIN, THE VALUE OF THE QIP4 INTEREST IS UNDETERMINABLE AND MAY HAVE LITTLE OR NO CURRENT VALUE AND THUS THE ONLY WAY FOR SUCH MEMBERSHIP INTEREST TO ACQUIRE VALUE IS FOR THE UNDERLYING ASSETS AND COMPANIES OF QG TO SIGNIFICANTLY APPRECIATE IN VALUE WHICH IS BOTH UNCERTAIN AND SPECULATIVE. THE PARTICIPANT FURTHER ACKNOWLEDGES AND AGREES THAT NEITHER QG, THE QG COMPANIES, QIP4, NOR ANY OF THE RESPECTIVE OFFICERS, OWNERS OR PROFESSIONALS OF SUCH ENTITIES HAVE MADE ANY REPRESENTATIONS TO THE PARTICIPANT THAT THE VALUE OF THE QIP4 INTEREST WILL IN FACT APPRECIATE OR OTHERWISE ACQUIRE A VALUE IN THE FUTURE. BY ENTEREING INTO THIS AGREEMENT QG IS MERELY GIVING THE PARTICIPANT THE OPPORTUNITY TO SHARE IN ANY APPRECIATION THAT MIGHT OCCUR IN QG BUT IS NOT MAKING ANY WARRANTIES OR REPRESENTATION THAT ANY APPRECIATION IN QG WILL ACTUALLY OCCUR.

10) <u>Remedy for Certain Breaches</u> – In the event that either (i) the Participant, although remaining employed by the Company has fully vested in their QIP4 Interest or (ii) after the Participant has terminated their Employment with the Company (whether or not they have fully vested in their QIP4 Interest) and such Participant violates any of the provisions contained in Section 6(c), 6(d), 6(f), and 6(g) of this Agreement (collectively a "**Breach**") then the Participant shall return and otherwise repay to the Company such portion of the aggregate cash distributed to them (either as a lump sum or in installments) as a result of their ownership of the QIP4 Interest which is attributable to a Capital Event (the "**QIP Distribution**") under the following schedule:

a. If the Breach occurs within one year from the earlier of the date that they become fully vested or the date their Employment is terminated then the Participant is required to return 100% of the QIP Distribution;

b. If the Breach occurs within two years from the earlier of the date that they become fully vested or the date their Employment is terminated then the Participant is required to return 66% of the QIP Distribution;

c. If the Breach occurs within three years from the earlier of the date that they become fully vested or the date their Employment is terminated then the Participant is required to return 33% of the QIP Distribution;

Notwithstanding anything contained herein to the contrary nothing contained in this Section 10 of this Agreement shall prevent, mitigate, alter, modify, waive, or otherwise change the right or availability of the Company, QG or any of its Affiliates (collectively the "**Injured Party**") to seek legal recourse, collect damages or to obtain any other remedies otherwise available to the Injured Party, whether in law or in equity (collectively "Remedies"), resulting from any such Breach provided that any monetary Remedies obtained by the Injured Party (other than for repayment or reimbursement of attorney fees and costs associated with the litigation seeking such Remedies) shall be reduced, but not below zero, by the amount of repayment received by the Company under this Section 10.

11) Miscellaneous:

a) <u>Governing Law</u>. This Agreement and all matters relating to this Agreement shall be construed and controlled by the laws of the State of Texas as applied to agreements executed and performed entirely in Texas by Texas residents, without reference to its conflict of law principles.

b) <u>Alternative Dispute Resolution</u>. To the fullest extent permitted by law, all disputes between Participant (and his attorneys, successors, and assigns) and the Company (and its affiliates, partners, shareholders, directors, officers, employees, agents, successors, attorneys, and assigns) of any kind whatsoever, including, without limitation, all disputes relating in any manner to the Employment or termination of Participant, and any dispute, controversy or claim arising out of or in connection with this Agreement or the breach, cancellation or validity of this Agreement, ("**Arbitrable Claims**") shall be resolved by arbitration. All persons and entities specified in the preceding sentence (other than the Employer and Participant) shall be considered third-party beneficiaries of the rights and obligations created by this Arbitration Agreement. Arbitrable Claims shall include, but are not limited to, contract (express or implied) and tort claims of all kinds, as well as all claims based on any federal, state, or local law, statute, or regulation, excepting only claims under applicable workers' compensation law and unemployment insurance claims. By way of example and not in limitation of the foregoing, Arbitrable Claims shall include (to the fullest extent permitted by law) any claims arising under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Americans with Disabilities Act, and the Texas Commission on Human Rights Act, as well as any claims asserting wrongful termination, harassment, breach of contract, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, negligent or intentional misrepresentation, negligent or intentional interference with contract or prospective economic advantage, defamation, invasion of privacy, and claims related to disability. Provided, however, either the employer or the employee may bring suit in an appropriate court of competent jurisdiction to protect trade secrets, confidential information, and/or to enforce or construe rights (i) relating to the Participant's use of confidential information in post-Employment activities or (ii) under the parties'

confidentiality, non-solicitation and or non-competition agreement(s). Arbitration of Arbitrable Claims shall be in accordance with the National Rules for the Resolution of Employment Disputes of the American Arbitration Association, as amended ("**AAA Employment Rules**"), as augmented in this Arbitration Agreement. Arbitration shall be initiated as provided by the AAA Employment Rules, although the written notice to the other party initiating arbitration shall also include a statement of the claim(s) asserted and the facts upon which the claim(s) are based. Arbitration shall be final and binding upon the parties and shall be the exclusive remedy for all Arbitrable Claims. Either party may bring an action in court to compel arbitration under this Arbitration Agreement or to obtain judgment to enforce an arbitration award. Otherwise, neither party shall initiate or prosecute any lawsuit or administrative action in any way related to any Arbitrable Claim. Notwithstanding the foregoing, either party may, at its option, seek and obtain, if appropriate, temporary or preliminary injunctive relief in a court of competent jurisdiction. All arbitration hearings under this Arbitration Agreement shall be conducted in Houston, Harris County, Texas. The Federal Arbitration Act shall govern the interpretation and enforcement of this agreement to arbitrate. THE PARTIES HEREBY WAIVE ANY RIGHTS THEY MAY HAVE TO TRIAL BY JURY IN REGARD TO ARBITRABLE CLAIMS, INCLUDING WITHOUT LIMITATION ANY RIGHT TO TRIAL BY JURY AS TO THE MAKING, EXISTENCE, VALIDITY, OR ENFORCEABILITY OF THE AGREEMENT TO ARBITRATE. A single arbitrator shall decide all disputes involving Arbitrable Claims. The arbitrator shall be selected by mutual agreement of the parties within thirty (30) days of the effective date of the notice initiating the arbitration. If the parties cannot agree on an arbitrator, then the complaining party shall notify the AAA and request selection of an arbitrator in accordance with the AAA Employment Rules. The arbitrator shall have only such authority to award equitable relief, damages, costs, and fees as a court would have for the particular claim(s) asserted. The fees of the arbitrator shall be split between both parties equally. If the allocation of responsibility for payment of the arbitrator's fees would render the obligation to arbitrate unenforceable, the parties authorize the arbitrator to modify the allocation as necessary to preserve enforceability. The arbitrator shall have exclusive authority to resolve all Arbitrable Claims, including, but not limited to, whether any particular claim is arbitrable and whether all or any part of this Arbitration Agreement is void or unenforceable. The award shall not include any punitive damages. Enforcement of the award of the arbitrators may be obtained in any court of competent jurisdiction. The expenses of the arbitration, including, without limitation, the costs and disbursements of all legal counsel, shall be borne as determined by the arbitrators in all cases.

c) <u>Severability</u>. In case any one or more of the provisions contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If, moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

d)      Notices.  All notices, summons and communications related to this Agreement and sent by either party hereto to the other shall be given in writing by registered mail, overnight courier (return receipt requested) or by facsimile also confirmed by air mail or internationally recognized courier.  Any such notice shall be deemed to have been duly given or made when delivered personally or seven (7) calendar days after posting or if sent by facsimile, thirty-six (36) hours after dispatch to the party to which such notice is required to be given or made under this Agreement.

e)      Time.  Time is of the essence in this Agreement and in the performance of every covenant or undertaking hereunder.

f)      Waiver.  The failure of a party to prosecute its rights with respect to a default or breach hereunder shall not constitute a waiver of the right to enforce its rights with respect to the same or any breach.

g)      Headings.  Captions and headings contained in this Agreement have been included for ease of reference and convenience and shall not be considered in interpreting or construing this Agreement.

h)      Entire Agreement.  This Agreement and all Exhibits referred herein embody the entire understanding of the parties with respect to the subject matter hereof and shall supersede all previous communications, representations or understandings, either oral or written, between the parties relating to the subject matter hereof.

i)      Counterparts/Facsimile.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Furthermore, each party agrees to accept the facsimile signature of the other parties to this Agreement as evidence of the execution and delivery of this Agreement.  Such facsimile signature will be deemed to be binding upon the party sending such facsimile signature.

j)      Attorney's Fees.  Should legal action be instituted by either party to enforce their rights hereunder the prevailing party shall be entitled to their attorney's fees and costs.

k)      Assignment.  This Agreement shall be binding upon and inure to the benefit of the Employer and any other person, association, or entity that may acquire or succeed to all or substantially all of the business or assets of the Employer (including the Successor Employer).  Participant's rights and obligations under this Agreement are personal, and they shall not be assigned or transferred without the Employer's prior written consent.  Furthermore, in the event of a Capital Event, then from and after such date the Successor Employer shall step into and acquire the rights incident to this Agreement held by QG and or Employer provided that such rights shall be held concurrent with but subordinate to the rights held by QG and Employer and nothing contained herein shall

prevent QG and or Employer from enforcing their respective rights under this Agreement from and after any such Capital Event.

l) <u>Waiver</u>. In accepting this Agreement, the Participant hereby (i) voluntarily waives any and all rights the Participant may otherwise have under the QIP1 Agreement, and (ii) releases and forever discharges QG, its successors, predecessors, parents, subsidiaries, affiliates, assigns, directors, officers, agents and employees, both jointly and severally, from any and all actions, causes of actions, claims, demands, charges or suits of any kind whatsoever relating to the QIP1 Agreement.

m) <u>409A Compliance.</u> This Agreement is intended to comply with Section 409A of the Internal Revenue Code of 1986, as amended (the "Code") (including the provisions that provide exemptive relief from the application of Section 409A of the Code) and will be interpreted in such a manner so as to comply with Section 409A of the Code.

n) <u>Whistleblower Immunity.</u> Nothing in this Agreement or any other agreement or policy of Company prohibits you from reporting an event that you reasonably and in good faith believe is a violation of law to the relevant law-enforcement agency (such as the Securities and Exchange Commission), requires you to notify or get permission from Company before such report, or prohibits cooperating in an investigation conducted by such a government agency, and you have been notified that you cannot be prosecuted civilly or criminally for a disclosure of information that complies with the limitations of the Defend Trade Secrets Act of 2016, 18 U.S.C. §1833(b). You further understand, however, that other Company policies may require you to report the underlying event (but not the fact that you reported it to an authority or are cooperating in an investigation) to the Chief Compliance Officer or other member of management in a position to take corrective action. In all other respects this Agreement's confidentiality and non-disparagement obligations will be respected and any disclosures of confidential information under the foregoing exception shall be limited to only what is necessary for law enforcement purposes (such as communications with the relevant government agency or court or your legal counsel).

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representative as of the date first above written.

*[Signature Page to Follow]*

Signature Page to David Reynolds Vesting and Participation Agreement

**QUANTLAB GROUP, LP**

By: Quantlab Group GP, LLC
Its: General Partner

By: _____
W.E. "Ed" Bosarge, Jr.
Its: Manager

Date: 10/13/17

**QUANTLAB FINANCIAL, LLC**

By: _____
Tim McInturf
Its: Secretary

Date: 10/13/17

**PARTICIPANT:**

_____
David Reynolds

Date: 10/13/17