**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **QUANTLAB FINANCIAL, LLC and QUANTLAB GROUP, L.P.,** | § § § | **CIVIL ACTION NO. 4:19-CV-03643** |
| *Plaintiffs & Counter-Defendants,* | § § § | **JURY DEMAND** |
| **v.** | § § | **HON. EWING WERLEIN, JR.** |
| **DAVID REYNOLDS,** | § § § | |
| *Defendant & Counter-Plaintiff.* | § § § § | |

**DEFENDANT DAVID REYNOLDS' VERIFIED ANSWER, AFFIRMATIVE
DEFENSES, COUNTERCLAIMS, AND JURY DEMAND TO
PLAINTIFFS QUANTLAB FINANCIAL, LLC AND QUANTLAB GROUP, L.P.'S
VERIFIED COMPLAINT AND APPLICATION FOR PRELIMINARY AND
PERMANENT INJUNCTIVE RELIEF**

Defendant David Reynolds ("Mr. Reynolds") files this Verified Answer, Affirmative Defenses, Counterclaims, and Jury Demand in response to Plaintiffs Quantlab Financial, LLC, and Quantlab Group, L.P., and their affiliates (collectively, "Quantlab").

## INTRODUCTION

Mr. Reynolds worked for Quantlab from 1999-2017, most recently as Chief Technology Officer. On July 13, 2017, Tim McInturf, president and CEO of Quantlab, advised Mr. Reynolds that he had a choice: He could voluntarily resign in exchange for severance, or Quantlab would involuntarily terminate Mr. Reynolds without severance. That afternoon, Mr. McInturf demanded the return of Mr. Reynolds' company phone and security pass and stated Mr. Reynolds was not allowed to re-enter the premises. From that date forward, Mr. Reynolds diligently complied with all post-employment restrictions and obligations.

Based on a solitary LinkedIn message sent by a third party recruiter (not by Mr. Reynolds) two years after Mr. Reynolds' departure, Quantlab has now filed baseless lawsuits against Mr. Reynolds *twice*. Quantlab even went so far as to seek an *ex parte* temporary restraining order against Mr. Reynolds in Polk County, Texas, despite knowing exactly where Mr. Reynolds was working in Chicago, Illinois, at the time. Quantlab has since received a sworn declaration from the author of the LinkedIn message upon which the paper-thin complaint was based, proving that Mr. Reynolds played no role whatsoever in the drafting or sending of that message. Regardless, Quantlab, while doing no investigation whatsoever, filed this frivolous lawsuit ***again***. Mr. Reynolds reserves his rights to seek all available relief for Quantlab's abuse of process, and responds as stated below.

### RESPONSES

To the extent Quantlab's assertions in the complaint under the unnumbered "Summary" heading are incorporated into Quantlab's complaint, Mr. Reynolds denies the allegations set forth in the Summary. To the extent Quantlab intends to make allegations in the complaint contained in headings, those allegations are also denied.

Mr. Reynolds responds to the numbered paragraphs in Quantlab's complaint in the numbered paragraphs below. For the avoidance of doubt, any allegation not expressly admitted in Mr. Reynolds' responses to each of the numbered paragraphs below is denied.

1. Mr. Reynolds admits that Quantlab Financial, LLC and Quantlab Group, L.P.'s principal place of business is in Houston, Texas. Mr. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 1 of the complaint.

2. Mr. Reynolds admits the allegations in paragraph 2 of the complaint.

3.     Paragraph 3 of the complaint sets forth Quantlab's jurisdictional allegations that present legal conclusions and questions of law to be determined solely by the Court, to which no answer is required.  To the extent that a response is required, Mr. Reynolds avers that the Court has jurisdiction under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties.  Mr. Reynolds admits that Quantlab has alleged damages exceeding $75,000, but denies that Quantlab is entitled to any damages or other relief whatsoever.

4.     Mr. Reynolds admits the allegations in paragraph 4 of the complaint.

5.     Mr. Reynolds admits that venue is proper in this Court, as provided in the Loyalty Agreement and as alleged in paragraph 5 of the complaint.  Mr. Reynolds denies the allegations in the footnote contained in paragraph 5 of the complaint; Quantlab was on notice that Mr. Reynolds resided in Chicago, Illinois, when it filed its initial lawsuit in Polk County, Texas.  Mr. Reynolds admits that Quantlab voluntarily dismissed its first-filed lawsuit against him.

6.     Paragraph 4 of the complaint sets forth Quantlab's jurisdictional allegations that present legal conclusions and questions of law to be determined solely by the Court, to which no response is required.  To the extent an answer is required, Mr. Reynolds admits that when he worked for Quantlab, he worked in Harris County, Texas, which is within the Southern District of Texas, but denies that he was involved in any of the "solicitation events" alleged in the complaint at all.

7.     Mr. Reynolds admits that Quantlab is a research firm that employs scientists and others to develop and maintain proprietary trading systems used on financial markets by affiliated financial companies around the world.  Mr. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 7 of the complaint.

8.     Mr. Reynolds admits that while he worked for Quantlab, it used trading strategies that were created using mathematical and statistical modeling in an effort to take advantage of market inefficiencies and make profits and that, while he worked for Quantlab, sometimes some of those trading strategies made money.  Mr. Reynolds lacks knowledge or information sufficient to form a belief about whether any of the allegations in paragraph 8 of the complaint are true at any point following July 14, 2017.

9.     Mr. Reynolds admits that while he worked for Quantlab, it used trading technologies and strategies applied across a wide spectrum of financial instruments and markets, some of which were used for automated trading.  Mr. Reynolds admits that while he worked for Quantlab, some of its systems relied on high-speed computing and real-time market data.  Mr. Reynolds admits that while he worked for Quantlab, some of its trading strategies made money.  Mr. Reynolds lacks knowledge or information sufficient to form a belief about whether any of the allegations in paragraph 9 of the complaint are true at any point following July 14, 2017.

10.     Mr. Reynolds admits that automated trading is a highly competitive industry.  Mr. Reynolds denies that "success" in the industry is "dependent" on intellectual property and trade secrets.  Mr. Reynolds admits that, sometimes, small incremental improvements in trading technologies and strategies can create competitive advantages.  Mr. Reynolds admits that prior to July 14, 2017, Quantlab employed some highly educated and experienced individuals who worked on its trading systems and strategies.  Mr. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in paragraph 10 of the complaint and lacks knowledge or information sufficient to form a belief about any of the allegations related to Quantlab at any time following July 14, 2017.

11.     Mr. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 11 of the complaint.

12.     Mr. Reynolds lacks knowledge or information sufficient to form a belief about the truth of the allegations in paragraph 12 of the complaint.

13.     Mr. Reynolds admits that he is a Ph.D. mathematician and served as Quantlab's Chief Technology Officer ("CTO"), a senior management position.  Mr. Reynolds denies that he was employed at Quantlab from August 1999 through August 2017.  Mr. Reynolds lacks knowledge or information sufficient to form a belief as to whether it was a "highly-compensated . . . position of unusual significance and exposure to Quantlab's technology."

14.     Mr. Reynolds admits that he had access to certain confidential information prior to July 14, 2017, as part of his role as CTO.  Mr. Reynolds denies the remaining allegations in paragraph 14 of the complaint.

15.     Mr. Reynolds admits that he was provided with Quantlab's confidential information as part of his role as CTO and that, as CTO, he did help improve upon Quantlab's trading systems.  Mr. Reynolds denies the remaining allegations in paragraph 15 of the complaint and lacks knowledge of any information relating to Quantlab during any time period following July 14, 2017.

16.     Mr. Reynolds admits that prior to July 14, 2017, he was the CTO, he reported functionally to Quantlab's management in Houston, including but not limited to Quantlab's Chief Scientist, he supervised employees who worked on technology development, and he participated in management meetings.  Mr. Reynolds also admits that, prior to July 14, 2017, he had access to some information that Quantlab considers confidential.  Mr. Reynolds denies the remaining allegations in paragraph 16 of the complaint.

17.    Mr. Reynolds admits that Exhibit A attached to the complaint was signed by Quantlab Financial, LLC on October 26, 2011.   The remaining allegations present legal conclusions to which no response is required.  To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 17 (including footnote 2) of the complaint.

18.    Mr. Reynolds admits that Section 3(f) of the Loyalty Agreement contains the language in paragraph 18 of the complaint.

19.    Mr. Reynolds admits that Section 4(c) of the Loyalty Agreement contains the language in paragraph 19 of the complaint.

20.    Mr. Reynolds admits that Section 4(f) of the Loyalty Agreement contains the language in paragraph 20 of the complaint.

21.    Mr. Reynolds admits that Section 4(g) of the Loyalty Agreement contains the language in paragraph 21 of the complaint.  The remaining allegations present legal conclusions to which no response is required.  To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 21 of the complaint.

22.    Mr. Reynolds admits that Section 4(g) of the Loyalty Agreement contains the language in paragraph 22.   The remaining allegations present legal conclusions to which no response is required.  To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 22 of the complaint.

23.    Mr. Reynolds admits that Section 4(h) of the Loyalty Agreement contains the language in paragraph 23.   The remaining allegations present legal conclusions to which no response is required.  To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 23 of the complaint.

24.     Mr. Reynolds denies that his last day of employment was August 10, 2017 as alleged in paragraph 24 of the complaint.  Mr. Reynolds denies he remained eligible to participate in the employee equity incentive program through October 2017.  Mr. Reynolds admits that he was provided his final paycheck on August 31, 2017 and that his LinkedIn work history describes his employment with Quantlab as being August 1999 through August 2017.

25.     Mr. Reynolds admits that Exhibit B attached to Quantlab's complaint is a Letter Agreement dated September 28, 2017.  Mr. Reynolds also admits that in the Letter Agreement Quantlab agreed to modify the Non-Competition restrictions of the Loyalty Agreement to one year and waived any ability to assert any longer term.  The remaining allegations in paragraph 25 of the complaint present legal conclusions to which no response is required.  To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 25 of the complaint.

26.     Mr. Reynolds admits that Exhibit B was signed by Mr. Reynolds on October 13, 2017 and that a Vesting and Participation Agreement, attached to Quantlab's complaint as Exhibit C, is dated October 13, 2017.  The remaining allegations in paragraph 26 of the complaint present legal conclusions to which no response is required.  To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 26 of the complaint.

27.     Mr. Reynolds admits that Paragraph 6(d) of Exhibit C contains the language in paragraph 27 of the complaint.  The remaining allegations in paragraph 27 of the complaint present legal conclusions to which no response is required.  To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 27 of the complaint.

28.     Mr. Reynolds admits that Paragraph 6(j) of Exhibit C contains the language in paragraph 28 of the complaint.  The remaining allegations in paragraph 28 of the complaint present

legal conclusions to which no response is required. To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 28 of the complaint.

29.     Mr. Reynolds admits that Paragraph 6(k) of Exhibit C contains the language in paragraph 29 of the complaint. The remaining allegations in paragraph 29 of the complaint present legal conclusions to which no response is required. To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 29 of the complaint.

30.     Mr. Reynolds denies that Plaintiffs have any reason to believe that he has engaged in conduct that violates the restrictions of his Loyalty Agreement and Vesting and Participation Agreement, as modified by the Letter Agreement, and denies the other allegation in paragraph 30 of the complaint.

31.     Mr. Reynolds admits he began employment at Citadel as Head of Systematic Trading Technology in December 2018 and has some responsibility for real-time trading platforms and low-latency software development. Mr. Reynolds denies that these are "some of the same" responsibilities he had at Quantlab. Mr. Reynolds admits that his employment with Citadel did not violate any restrictions when he started the job in December 2018. Mr. Reynolds denies the remaining allegations in paragraph 31 of the complaint.

32.     Mr. Reynolds lacks knowledge or information sufficient to know whether or not "at least three current employees of Quantlab received a solicitation on LinkedIn from a recruiter," and denies that he played any role in any such solicitation. Mr. Reynolds denies the remaining allegations in paragraph 32 of the complaint.

33.     Mr. Reynolds admits that Demian Kosofsky resigned from Quantlab sometime in 2019, although Mr. Reynolds only learned of that resignation sometime after Mr. Kosofsky's resignation from Quantlab. Mr. Reynolds denies that he has been "involved" in any way with the

recruitment of any then-current Quantlab employee since joining Citadel, and denies the remaining allegations in paragraph 33 of the complaint.

34.　　Mr. Reynolds denies the allegations in paragraph 34 of the complaint.

35.　　Mr. Reynolds denies the allegations in paragraph 35 of the complaint.

36.　　Mr. Reynolds denies the allegations in paragraph 36 of the complaint.

37.　　Mr. Reynolds' responses to all the preceding paragraphs are incorporated herein by reference.

38.　　Mr. Reynolds admits that Quantlab seeks a declaratory judgment even though it is prohibited from doing so as a matter of law. Mr. Reynolds denies that Quantlab is entitled to a declaratory judgment or any other relief. Mr. Reynolds' responses to all the allegations above are incorporated by reference.

39.　　Mr. Reynolds admits that Quantlab seeks a declaratory judgment even though it is prohibited from doing so as a matter of law. To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 39 of the complaint, including subparagraphs (a)-(f).

40.　　The allegations in paragraph 40 of the complaint present legal conclusions to which no response is required. To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 40 of the complaint.

41.　　Mr. Reynolds' responses to all the preceding paragraphs are incorporated herein by reference.

42.　　The allegations in paragraph 42 of the complaint present legal conclusions to which no response is required. To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 42 of the complaint.

43.　　Mr. Reynolds denies the allegations in paragraph 43 of the complaint.

44.     Mr. Reynolds denies the allegations in paragraph 44 of the complaint.

45.     Mr. Reynolds denies the allegations in paragraph 45 of the complaint.

46.     Mr. Reynolds' responses to all the preceding paragraphs are incorporated herein by reference.

47.     The allegations in paragraph 47 of the complaint present legal conclusions to which no response is required.  To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 47 of the complaint.

48.     Mr. Reynolds denies the allegations in paragraph 48 of the complaint.

49.     Mr. Reynolds denies the allegations in paragraph 49 of the complaint.

50.     Mr. Reynolds denies the allegations in paragraph 50 of the complaint.

51.     Mr. Reynolds' responses to all the preceding paragraphs are incorporated herein by reference.

52.     Mr. Reynolds denies the allegations in paragraph 52 of the complaint because Quantlab breached the Letter Agreement.

53.     Mr. Reynolds denies the allegations in paragraph 53 of the complaint.

54.     Mr. Reynolds denies the allegations in paragraph 54 of the complaint.

55.     Mr. Reynolds' responses to all the preceding paragraphs are incorporated herein by reference.

56.     Mr. Reynolds denies the allegations in paragraph 56 of the complaint.

57.     Mr. Reynolds denies the allegations in paragraph 57 of the complaint.

58.     Mr. Reynolds denies the allegations in paragraph 58 of the complaint, including subparagraphs (a)-(f).

59.     Mr. Reynolds' responses to all the preceding paragraphs are incorporated herein by reference.

60.     The allegations in paragraph 60 of the complaint present legal conclusions to which no response is required.  To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 60 of the complaint.

61.     The allegations in paragraph 61 of the complaint present legal conclusions to which no response is required.  To the extent a response is required, Mr. Reynolds denies the allegations in paragraph 61 of the complaint.

62.     Mr. Reynolds denies the allegations in paragraph 62 of the complaint.

WHEREFORE, Mr. Reynolds respectfully requests that the Court: (a) find for Mr. Reynolds, and against Plaintiffs, on each count in the complaint; (b) award Mr. Reynolds his costs and attorneys' fees; and (c) award Mr. Reynolds such other and further relief as is just and proper.

## AFFIRMATIVE DEFENSES

Mr. Reynolds asserts the following affirmative defenses, without assuming the burden of proof where it would otherwise be on Plaintiffs.

1.     Quantlab fails to state a claim on which relief can be granted.  In particular, Quantlab is prohibited as a matter of law from pleading a declaratory judgment claim where the same conduct is alleged to be a breach of one or more contracts.

2.     Mr. Reynolds asserts the affirmative defense of estoppel.  Among other things, Quantlab released Mr. Reynolds from his non-competition obligations following a one-year period subsequent to his Quantlab employment.  Quantlab specifically entered into a Letter Agreement in which Mr. Reynolds' non-competition obligations were limited to one year.  As Quantlab admits, Mr. Reynolds did not compete with Quantlab for more than a year after his departure.

Quantlab's assertion that it can somehow reinstate a non-compete period more than a year after it ended is legally frivolous and incorrect as a matter of law and basic logic.

3. Mr. Reynolds asserts the affirmative defense of release. Among other things, Quantlab released Mr. Reynolds from his non-competition obligations following a one-year period subsequent to his Quantlab employment. Quantlab specifically entered into a Letter Agreement in which Mr. Reynolds' non-competition obligations were limited to one year. As Quantlab admits, Mr. Reynolds did not compete with Quantlab for more than a year after his departure. Quantlab's assertion that it can somehow reinstate a non-compete period more than a year after it ended is legally frivolous and incorrect as a matter of law and basic logic.

4. Mr. Reynolds asserts the affirmative defense of waiver. Among other things, Quantlab released Mr. Reynolds from his non-competition obligations following a one-year period subsequent to his Quantlab employment. Quantlab specifically entered into a Letter Agreement in which Mr. Reynolds' non-competition obligations were limited to one year. As Quantlab admits, Mr. Reynolds did not compete with Quantlab for more than a year after his departure. Quantlab's assertion that it can somehow reinstate a non-compete period more than a year after it ended is legally frivolous and incorrect as a matter of law and basic logic.

5. Mr. Reynolds reserves the right to add affirmative defenses to Quantlab's claims at any time.

## COUNTERCLAIMS

David Reynolds ("Mr. Reynolds"), for his counterclaims against Counterclaim-Defendants Quantlab Financial, LLC, and Quantlab Group, L.P. (collectively "Quantlab"), alleges as follows:

## I.     PARTIES

1. Upon information and belief, Quantlab Financial, LLC, is a limited liability company duly formed and existing under the laws of the State of Delaware.

2.     Upon information and belief, Quantlab Group, L.P., is a limited partnership duly formed and existing under Delaware law.

3.     Mr. Reynolds is an individual who is domiciled in Chicago, Illinois.

## II.     JURISDICTION AND VENUE

4.     This Court has subject matter jurisdiction over Mr. Reynolds' counterclaims under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the amount in controversy, described herein, exceeds $75,000, exclusive of interest and costs, and under 28 U.S.C. § 1367(a) because the counterclaims are so related to Quantlab's claims that they form part of the same case or controversy under Article III of the United States Constitution.

5.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these counterclaims occurred in Houston.

## III.     FACTUAL BACKGROUND

### A.     Mr. Reynolds Joins Quantlab and Serves as a Loyal Employee for Nearly 20 Years

6.     Mr. Reynolds began employment at Quantlab in 1999.  He was promoted to Chief Technology Officer ("CTO"), his position when he was constructively terminated in 2017.

7.     Part of Mr. Reynolds' compensation included equity incentives, including a participation interest in Quantlab Trading Partners LP ("QTP") and Quantlab Incentive Partners I, LLC ("QIP I").

### B.     Quantlab Terminates Mr. Reynolds Suddenly and Unexpectedly on July 13, 2017

8.     On July 13, 2017, Quantlab's CEO, Tim McInturf, advised Mr. Reynolds that Quantlab was restructuring its operations and gave Mr. Reynolds an ultimatum: 1) resign and receive severance, or 2) be involuntarily terminated and receive no severance.  Mr. Reynolds, having no choice, resigned, effective immediately.

9.      Indeed, that same afternoon, Mr. McInturf demanded that Mr. Reynolds hand over his company phone and security pass to prevent Mr. Reynolds from re-entering the premises. He then escorted Mr. Reynolds to the front door and that day, July 13, 2017, was the last time Mr. Reynolds ever set foot on Quantlab property.

10.     On July 14, 2017, Quantlab sent a representative to Mr. Reynolds' home and demanded return of his remaining company-issued equipment, including his laptop.

11.     On July 14, 2017, less than twenty-four hours later, Mr. McInturf sent an announcement about Mr. Reynolds' very sudden firing to the entire company.

12.     On July 24, 2017, Mr. Reynolds received a confirmation from Quantlab's benefits provider that his health insurance was terminated.

### C.      The Letter Agreement

13.     While Mr. Reynolds' last day of employment at Quantlab was July 14, 2017, Quantlab and Mr. Reynolds continued to negotiate his severance package after Quantlab had escorted Mr. Reynolds out of the building, retrieved all of his Quantlab property, and terminated Mr. Reynolds' health insurance.

14.     During his employment, Mr. Reynolds entered into an Employee Loyalty, Confidentiality, Inventions, Non-solicitation and Non-competition Agreement (the "Loyalty Agreement"). *See* Dkt. No. 1-1. The Loyalty Agreement contained a two-year non-competition provision following Mr. Reynolds' termination. *See id.* ¶ 4(c). The Loyalty Agreement also contained a two-year non-solicitation provision. *See id.* ¶ 4(f).

15.     On September 28, 2017, the parties entered a General Release and Waiver (the "Letter Agreement"), which outlined Mr. Reynolds' separation benefits. *See* Dkt. No. 1-2. Mr. Reynolds released certain employment claims against Quantlab, as well as forfeited his participation interests in QTP and QIP I.

16.     In exchange, Mr. Reynolds received a reduction of his non-competition restriction from two years to one year.  *See* Dkt. No. 1-2 at 8.  More specifically, the Letter Agreement provides that "[t]he Company will limit the non-competition period of paragraph 4(c) of the Loyalty Agreement to one year and waive the second year of the non-competition period in the Loyalty Agreement."  *See* Dkt. No. 1-2 at 8.

17.     Mr. Reynolds never breached the Loyalty Agreement and never breached the Letter Agreement.

18.     After one year had passed from Mr. Reynolds' departure from Quantlab, Mr. McInturf confirmed in writing to Mr. Reynolds that he had the legal right to go to work for a competitor.  Mr. Reynolds did not work for any Quantlab competitor for more than one year following his departure from Quantlab.

19.     Despite Mr. Reynolds' compliance with both the Loyalty Agreement and the Letter Agreement, Quantlab refused to recognize the provision in the Letter Agreement limiting the non-competition period of the Loyalty Agreement to one year.  Instead, Quantlab sought an *ex parte* TRO from a court in Polk County, Texas, even though it knew that Mr. Reynolds was working for Citadel in Chicago, Illinois, and could easily have given Mr. Reynolds notice and an opportunity to be heard.  Quantlab then sought to enforce the very non-competition period that it had released, in plain violation of the Loyalty Agreement.

20.     As part of the Letter Agreement, Mr. Reynolds also exchanged his QIP I interests for interests in QIP IV, which also holds a limited partnership interest in Quantlab Group entitling Mr. Reynolds to profits from Quantlab Group.

21.     Quantlab has refused to provide Mr. Reynolds with the interests in QIP IV that it promised him as part of the Letter Agreement.  Mr. Reynolds has complied in full with that

agreement, and thus Quantlab had no basis whatsoever to deem Mr. Reynolds' interests in QIP IV void. Quantlab took the position that Mr. Reynolds was in breach despite having no evidence that Mr. Reynolds did anything wrong, even though even a modest investigation would have demonstrated that Quantlab's position was incorrect.

### B. The Vesting & Participation Agreement

22.     In order to effectuate Mr. Reynolds' receipt of a membership interest in QIP IV, as bargained for in the Letter Agreement, the parties entered into a separate Vesting & Participation Agreement dated October 13, 2017 (the "VPA"). *See* Dkt. No. 1-3.

23.     Pursuant to the VPA, Mr. Reynolds is entitled to a 75.00018% membership interest in QIP IV. *See id.* ¶ 2. Mr. Wilbur Borsage, owner of Quantlab, has told Mr. Reynolds repeatedly, including in writing, that the value of Mr. Reynolds' interest in QIP IV is approximately $25 million.

24.     The VPA also limited Mr. Reynolds' non-competition restriction to only 12 months following termination, not 24 months. *See id.* ¶ 5(f).

25.     Quantlab has renounced its obligation to provide Mr. Reynolds his membership interest in QIP IV. Quantlab has done so even though Mr. Reynolds has complied in full with all of his agreements with Quantlab.

### C. Mr. Reynolds Diligently Waits Out His One Year Non-Competition Restriction and Joins Citadel in December 2018

26.     Mr. Reynolds took his obligations under the Letter Agreement and VPA seriously, including his one-year obligation not to compete with Quantlab. From the time of his termination in July 2017 until December 2018, Mr. Reynolds did not work for any competitor.

27.     Mr. Reynolds proactively contacted Quantlab to ensure he was strictly complying with the applicable agreements. Prior to ever working for Citadel, Mr. Reynolds wrote Mr.

McInturf to ask whether Quantlab needed to know about Mr. Reynolds' intent to work for a competitor. On November 20, 2018, Mr. McInturf replied: "Technically, you must let us know where you are going, but the noncompet[ition] agreement will not stop you from going there." Mr. Reynolds fully complied with Mr. McInturf's request—despite his suggestion it was a mere technicality—by writing to Mr. McInturf on December 5, 2018, advising him that Mr. Reynolds was going to work for Citadel in Illinois.

28.     Quantlab, however, never reciprocated. Not once after Mr. Reynolds' termination did Quantlab contact Mr. Reynolds to determine whether any action the company had taken or planned to take was in compliance with the Letter Agreement. Quantlab's failures occurred despite Quantlab and Mr. McInturf's knowledge that Mr. Reynolds had, more than once, diligently and in good faith acted in compliance with the Letter Agreement and had even contacted Quantlab directly—by telephone and email—to ensure his own compliance.

29.     After Mr. Reynolds emailed Mr. McInturf to let him know that Mr. Reynolds would be starting work at Citadel in Illinois, Mr. McInturf responded, "Wow. Congratulations."

30.     Mr. Reynolds also honored his two-year non-solicitation agreement. After joining Citadel, Mr. Reynolds made sure he continued to comply with his remaining obligations.

31.     Quantlab has alleged that on July 28, 2019, unidentified employees at Quantlab received LinkedIn messages from a third party recruiter. Mr. Reynolds had no involvement in the messages and no awareness that such messages were sent.

32.     Indeed, the employee who sent the LinkedIn messages subsequently confirmed under oath not only that she drafted the LinkedIn messages without any direction from her supervisors or from Citadel, but that she never communicated with any employee at Citadel about a position at Citadel on Mr. Reynolds team, including Mr. Reynolds.

**D.     Quantlab Seeks a Baseless *Ex Parte* Temporary Restraining Order**

33.     Had Quantlab bothered to do any investigation whatsoever, it would have quickly determined that there was no wrongdoing by Mr. Reynolds—even assuming his non-solicitation restriction had not expired, which it most certainly had.

34.     Instead, on information and belief, Quantlab did not make even a single phone call to determine whether Mr. Reynolds had anything to do with the LinkedIn message sent by the third party recruiter.

35.     Quantlab made no effort to contact the third party recruiter who sent the LinkedIn message that it relied upon prior to filing its first lawsuit against Reynolds.

36.     Quantlab has no evidence whatsoever that the third party recruiter who sent the LinkedIn message it relies upon did so at the direction or behest of Mr. Reynolds prior to filing its first lawsuit against Reynolds.

37.     Instead, without any warning or attempt to contact Mr. Reynolds (who was easily reachable via email or phone), Quantlab rushed to file a lawsuit in Polk County, Texas, seeking an improper *ex parte* temporary restraining order.

38.     After Mr. Reynolds properly removed the Polk County lawsuit to the Eastern District of Texas (because, as Quantlab was aware, Mr. Reynolds moved to Chicago, Illinois when he joined Citadel) Quantlab subsequently dismissed that suit and Mr. Reynolds thought that was the end of the harassment.

39.     Instead, Quantlab filed yet another baseless suit in this Court.

40.     Quantlab made no effort to contact the third party recruiter who sent the LinkedIn message that it relied upon prior to filing its second lawsuit against Reynolds even though it had been advised that Mr. Reynolds had absolutely nothing to do with sending the LinkedIn message.

41.     Quantlab had no evidence whatsoever that the third party recruiter who sent the LinkedIn message it relies upon did so at the direction or behest of Mr. Reynolds prior to filing its second lawsuit against Reynolds.

42.     Quantlab has damaged Mr. Reynolds substantially.  Mr. Reynolds was forced out of work for a short time period, causing him damages.  Mr. Reynolds was forced to take a trip he otherwise would not have taken to Polk County, Texas, causing him out-of-pocket damages.  Mr. Reynolds has also suffered damages from Quantlab's repudiation of its obligation to provide Mr. Reynolds his membership interest in QIP IV, an interest which, according to Quantlab's owner, is worth $25 million.

43.     Quantlab has done all of this for an improper purpose.  Mr. Reynolds has no remaining restrictive covenants from his employment at Quantlab.  All such covenants are expired.  Quantlab sued Mr. Reynolds, with knowledge that its claims lack merit, only in an effort to deter other employees from leaving the firm, even though they have every right to seek greener pastures.

IV.     **CAUSES OF ACTION**

A.     **First Counterclaim - Breach of the Letter Agreement**

44.     All preceding paragraphs are incorporated by reference.

45.     On September 28, 2017, Quantlab executed the Letter Agreement, which was signed by Mr. Reynolds on October 13, 2017.  The Letter Agreement is a valid and enforceable written contract.

46.     Mr. Reynolds at all times fully performed his contractual obligations.  All conditions precedent necessary for Mr. Reynolds' enforcement of the Letter Agreement have been satisfied.

47.     Quantlab breached the Letter Agreement by failing to limit Mr. Reynolds' non-competition restriction to one year, as was required in the Letter Agreement.

48.     Quantlab breached the Letter Agreement by failing to provide Mr. Reynolds his allotted membership interest in QIP IV and by repudiating any obligation to provide Mr. Reynolds with his allotted membership interest in QIP IV.

49.     Mr. Reynolds suffered damages as a result of Quantlab's breach of the Letter Agreement.

50.     Mr. Reynolds is entitled to recover reasonable and necessary attorney fees under Texas Civil Practice & Remedies Code chapter 38 because this is a suit for breach of a written contract and the written contract contains a Texas choice-of-law provision. *See* Dkt. No. 1-2 at 6.

**B.     Second Counterclaim - Declaratory Judgment - VPA**

51.     All preceding paragraphs are incorporated by reference.

52.     On October 13, 2017, Mr. Reynolds and Quantlab executed the VPA, a valid and enforceable written contract.

53.     Mr. Reynolds fully performed his contractual obligations. All conditions precedent necessary for Mr. Reynolds' enforcement of the VPA have been satisfied.

54.     Quantlab has repudiated its contractual obligation to provide Mr. Reynolds his bargained-for membership interest in QIP IV. Quantlab lacks any just excuse for its repudiation because Mr. Reynolds at all times complied with his contractual obligations under the VPA.

55.     As a result of the acts described in the preceding paragraphs, there exists a real and substantial controversy involving a genuine conflict of tangible interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment under 28 U.S.C. § 2201(a). Quantlab's own principal has quantified potential damages to Mr. Reynolds for failure to provide the membership interest at $25 million.

56.     A judicial declaration is necessary and appropriate so that Mr. Reynolds may ascertain his rights regarding the VPA.

57.     Mr. Reynolds is entitled to a declaratory judgment that the VPA entitled Mr. Reynolds to his allotted membership interest in QIP IV.

## JURY DEMAND

Mr. Reynolds demands a trial by jury on all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Defendant and Counterclaim-Plaintiff Mr. Reynolds respectfully requests that the Court enter judgment as follows:

a.     Deny Quantlab all relief sought.

b.     On Mr. Reynolds' First Counterclaim, enter a judgment in Mr. Reynolds' favor, award Mr. Reynolds actual damages, and award Mr. Reynolds all other damages and interest to which he may be entitled.

c.     On Mr. Reynolds' Second Counterclaim, enter a declaratory judgment in Mr. Reynolds' favor.

d.     Award Mr. Reynolds his reasonable costs and fees, including all attorneys' fees spent in defense of Quantlab's claims in both lawsuits initiated against him by Mr. Reynolds, and in prosecuting Mr. Reynolds' breach of contract cases.

e.     Grant Mr. Reynolds such other and further relief as the Court deems just and proper.

DATED: December 3, 2019

**KIRKLAND & ELLIS LLP**
BY: */s Michael B. Slade*

Michael B. Slade
*(pro hac vice admission pending)*
Lead Attorney
TX Bar No. 24013521
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: mslade@kirkland.com

*and*

Anna B. Rotman
TX Bar No. 24046761
Rebekah Sills
TX Bar No. 24091427
609 Main Street
Houston, TX 77002
Telephone: (713) 836-3600
Facsimile: (713) 836-3601
Email: anna.rotman@kirkland.com
          rebekah.mcentire@kirkland.com

*Attorneys for Defendant, David Reynolds*

STATE OF _ILLINOIS_ )
                   ) ss.:
COUNTY OF _COOK_ )

## **VERIFICATION**

     Before me, the undersigned Notary Public, on this day personally appeared David Reynolds who, after being duly sworn, stated under oath that he has read Defendant David Reynolds' Verified Answer, Affirmative Defenses, Counterclaims, and Jury Demand and provides this affidavit and verifies that he has personal knowledge, and that the matters contained in Paragraphs 7-36 of the Verified Answer are true and correct.

                                  _David Reynolds_
                                  David Reynolds

SWORN TO AND SUBSCRIBED before me the on this _3rd_ day of December 2019.

_Brenda Berkowitz_
  Notary Public

OFFICIAL SEAL
BRENDA BERKOWITZ
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES 10/11/23

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served on all counsel of record via the Court's CM/ECF filing system on this 3rd day of December, 2019.

*/s/ Rebekah Sills*
Rebekah Sills