# Exhibit 3

Reynolds, David

## QUANTLAB FINANCIAL, LLC
## EMPLOYEE LOYALTY, CONFIDENTIALITY, INVENTIONS, NON-SOLICITATION, AND NON-COMPETITION AGREEMENT

This **Employee Loyalty, Confidentiality, Inventions, Non-Solicitation, and Non-Competition Agreement** ("Agreement") is entered into by and between the undersigned employee ("Employee") and Quantlab Financial, LLC (the "Company" or "Employer"), which may collectively be referred to in this Agreement as the "Parties."

WHEREAS, the Company researches, develops, implements and operates automated quantitative trading models or strategies on electronic markets around the world;

WHEREAS, the Company's trading models or strategies have value principally because they are not made public or disclosed to competitors but will become less effective if made public or used in competition with the Company;

WHEREAS, the Company desires to employ Employee in a position of trust and confidence that involves working with Employer's confidential and proprietary information and developing additional confidential and proprietary information for use by the Company;

WHEREAS, Employee desires to be employed in such a position;

WHEREAS, Employer agrees to disclose or grant access to confidential information to Employee upon Employee's execution and delivery of this Agreement, which Employee acknowledges is no more restrictive than necessary to protect Employer's confidential information and goodwill; and

THEREFORE, the Parties agree as follows:

1. TERM OF AGREEMENT. This Agreement shall continue in full force and effect for the duration of Employee's employment by Employer (the "Period of Employment") and shall continue thereafter unless or until terminated through a written instrument signed by all parties.

2. DUTY OF LOYALTY. Employee will perform the duties of his or her assigned position in accordance with the Company policies and rules of behavior. Employee will remain loyal to the Company at all times, avoid conflicts of interest, and promptly inform the Company of related business opportunities. Employee's compensation is provided to buy, among many other things, this loyalty. The parties agree that it shall be a conflict of interest for Employee to, among other things, compete with or prepare to compete with the Company while employed with the Company, or to thereafter compete with the Company in violation of this Agreement. Employee shall disclose to Employer the nature and scope of any other business activity in which he or she is or becomes engaged during the Period of Employment. This paragraph shall in no way limit any common law or statutory duties Employee owes to the Company or any rights the Company has against Employee.

3.  CONFIDENTIALITY AGREEMENT.

(a)  GENERALLY. Employee acknowledges that the business of the Company and its Affiliates is highly competitive. The Company will provide Employee with access to Confidential Information relating to the business of the Company and/or its Affiliates. The Company maintains all information and materials pertaining to Company and its Affiliates, their business and operations as confidential unless intentionally made public by the Company through proper means. Employee acknowledges that the Confidential Information and Proprietary Information items are useful, valuable, and unique assets of the Company. The parties agree to treat Confidential Information items as "Trade Secrets" under Texas Law, within the scope of the Uniform Trade Secrets Act, or under any other applicable law affording the Company protection from unauthorized use. However, irrespective of whether Confidential Information and Proprietary Information constitute Trade Secrets under applicable law, Employee agrees not to engage in any unauthorized use or disclosure of such information. This paragraph shall in no way limit any common law or statutory duties Employee owes to the Company or any rights the Company has against Employee.

(b)  CONFIDENTIAL INFORMATION. "Confidential Information" means and includes trade secrets and/or other information that has been developed or used and/or will be developed or used by or for the benefit, or at the expense, of the Company or its Affiliates that cannot be readily obtained through proper means by third parties from outside sources, in whatever form, tangible or intangible, pertaining to the business of Employer or any Affiliate, or their employees, investors, clients, consultants, or business associates. Employee understands, agrees and acknowledges that Quantlab's trading models or strategies, and the underlying ideas and information necessary to replicate those, are not readily available in academic works or other publications. Employee understands, agrees and acknowledges Quantlab's trading models or strategies consist of highly successful internally-developed combinations of ideas, mathematical formulas, and algorithms which have been incorporated into proprietary source code and are kept in the strictest confidence and are not readily available in academic works or other publications. Employee further understands, agrees and acknowledges that Quantlab has invested time and money developing its trading models or strategies and other internally-developed confidential and proprietary software and hardware combinations that are used to implement the models or strategies.

(c)  PROPRIETARY INFORMATION. "Proprietary Information" is all information and any idea in whatever form, tangible or intangible, pertaining to the business of Employer or any Affiliate, or their employees, investors, clients, consultants, or business associates, which was produced by any employee of Employer or any Affiliate in the course of his or her employment, or otherwise produced by, for or on behalf of Employer or any Affiliate.

(d)  EXAMPLES OF CONFIDENTIAL INFORMATION. Without limiting the foregoing definitions, Confidential Information shall include, but not be limited to: (1) formulas and development techniques, processes, trade secrets, computer programs, electronic codes, inventions, improvements, and research projects; (2) information about specific investments, costs, profits, markets, sales, and lists of investors, customers or clients; (3) business, marketing and strategic plans; (4) employee personnel files and compensation information; (5) tick-data

based indicators, mathematical approaches, computational algorithms, and parameter settings used to obtain short-term price prediction; (6) indicators and algorithms used for longer-term price prediction overlay on top of day-trading strategy, as well as approaches used to combine the overlay with the faster strategy within the same portfolio; (7) market microstructure modeling based on representation of time-delayed correlations and cross-correlations; (8) algorithms and approaches used to generate indicators based on book information and combination of different books coming from different trading venues; (9) specific assumptions and approximations for estimating the expected return for a given order and simulating order execution; (10) techniques for automatic factor detection using matrices derived from intraday data; (11) metrics used for performance analysis and real-time-monitoring of individual models or sub-strategies, and the criteria used in making trading decisions; (12) specific portfolio optimization methodology used in running the strategy,; (13) specific design, logic, and software architecture used for fitting microstructure models, generating price predictions, translating price predictions into trading decisions, trading strategy backtesting, performance monitoring and analysis; (14) computer software or data of any sort developed (in the case of software) or compiled (in the case of data) by Employer or an Affiliate; (15) Employer's or an Affiliate's current or prior use or evaluation of a particular computer program or system; (16) computational algorithms, procedures, methods, or techniques, or the essential ideas and principles underlying such algorithms, procedures, methods, or techniques, developed by Employer or an Affiliate (but excluding any public domain algorithm, procedure, or technique), whether or not such algorithms, procedures, methods, or techniques are embodied in a computer program; (17) Employer's or an Affiliate's current or prior use or evaluation of any particular computational algorithm, procedure, or technique developed by a party other than Employer or an Affiliate, whether or not such algorithm, procedure, or technique is embodied in a computer program; (18) trading strategies and order execution techniques developed, investigated, evaluated, or employed by Employer or an Affiliate, or any information that might reasonably be expected to lead to the development of such strategies, whether or not such information is embodied in a computer program; (19) information related to any market inefficiencies or anomalies, statistical price relationships or patterns, or phenomena related to the execution of orders discovered, investigated, measured, or exploited by Employer or an Affiliate, whether or not such information is embodied in a computer program; (20) the results of any analysis conducted by Employer or an Affiliate for its own internal use and not disseminated externally, including by not limited to the execution of actual or simulated trading experiments or the execution of computational studies involving historical data, including but not limited to price and economic data; (21) information regarding the rate of return, variability of return, or other statistical measures associated with any trading strategy developed, investigated, evaluated, or employed by Employer or an Affiliate, or any other information regarding the performance of such a strategy; (22) information related to the trading volume, capital deployment, or transaction costs associated with any of Employer's trading strategies, or with Employer or an Affiliate's trading in the aggregate; (23) any information that would typically be included in Employer or an Affiliate's income statements, including, but not limited to the amount of Employer or an Affiliate's revenues, expenses, or net income; (24) information regarding the classes of financial instruments traded on a proprietary (non-customer) basis by Employer or an Affiliate or studied by Employer or an Affiliate as candidates for such trading, or the classes of financial instruments known or believed by Employee as a result of his activities in the course of and through his

Employment with the company to offer the potential for profitable investment, trading, or market making activities; (25) strategies, practices, or techniques for market-making, agency trading, order crossing, or customer execution developed or engaged in by Employer or an Affiliate; (26) internal compilations analyses, and/or formatting of otherwise available information which have attained value or utility due to time and expense invested in such compilation, analysis, and/or formatting; (27) any other information about, or used in, the Company's or its Affiliates' business or operations that is not readily available to competitors of the Company or its Affiliates; (28) any other information gained in the course of Employee's Period of Employment with the Company or its Affiliates that could reasonably be expected to be deleterious to Employer or an Affiliate if disclosed to third parties, including without limitation any information that could reasonably be expected to aid a competitor of Employer or an Affiliate in making inferences regarding the nature of Employer or an Affiliate's proprietary trading activities; (29) any other information gained in the course of or incident to Employee's Period of Employment with the Company that Employer or an Affiliate has received from a third party and is required to hold confidential in connection with an agreement between Employer or an Affiliate and such third party; and (30) any other information gained in the course of or incident to Employee's Period of Employment with the company that Employer or an Affiliate treats or designates as Confidential Information and which is not publicly available.

(e)  AFFILIATE. For purposes of this Agreement, "Affiliate" shall mean any person or entity that directly or indirectly controls, is controlled by, or is under common control with the Company including but not limited to Quantlab Capital Management, Ltd., Quantlab Securities LP and Resonant Partners LP. In addition, the term shall also be deemed to include the following without regard to control: Quantlab Group, LP, Quantlab Holdings, LLC, Quantlab Technologies Ltd., Quantlab Trading Partners, LP, Quantlab Trading Partners, US, LP, Quantlab Trading Partners Offshore, Ltd., Q1 Partners, LP, Q1 Partners US, LP and Q1 Offshore Partners, Ltd. and all of their related companies, predecessors, successors, and assigns and any new entities that may be created by any Affiliate in the future.

(f)  RESTRICTIONS ON USE. Employee shall use Confidential Information and Proprietary Information only for the benefit of Employer and as authorized to carry out his or her responsibilities to Employer. Employee agrees that Employee will not, at any time during or after Employee's employment with the Company, make any unauthorized use or disclosure of any Confidential Information or Proprietary Information, or make any use thereof at all, except in the course and scope of Employee's employment with the Company and as necessary and authorized for the carrying out of Employee's employment responsibilities. Following termination, Employee shall neither directly nor indirectly, use or disclose any Confidential Information or Proprietary Information, except as expressly and specifically authorized in writing by Employer.

(g)  INFORMATION OF THIRD PARTIES USED BY THE COMPANY. Employee also agrees to preserve and protect the confidentiality of confidential information of third parties to the same extent, and on the same basis, as the Company's Confidential Information.

(h)  STEPS TO PROTECT INFORMATION. At all times, Employee agrees to use all reasonable and available methods to prevent the unauthorized use or disclosure of Confidential

Information and Proprietary Information. Depending upon the circumstances, available methods may include but are not limited to: marking information "Confidential," sharing information with authorized persons only on a need-to-know basis, maintaining the integrity of password protected computer systems, and otherwise storing information in a manner that prevents unauthorized access. Employee shall maintain at his or her work station and/or any other place under his or her control, only such Confidential Information and Proprietary Information as he or she has a current "need to know" in the furtherance of Employer's businesses. Employee shall return to the appropriate person or location or otherwise properly dispose of Confidential Information and Proprietary Information once that need to know no longer exists. Employee shall not make copies of or otherwise reproduce Confidential Information and Proprietary Information unless there is a legitimate business need of Employer for reproduction. Employee shall not store electronic data of the Company, including but not limited to Confidential Information and Proprietary Information, on any electronic storage device that is not owned by the Company without prior written consent of the Company. If Employee does use a computer or electronic storage device that is not owned by the Company to store Company data or access the Company network, with or without consent of the Company, Employee hereby agrees not to copy or disclose such information to any third party and to immediately surrender upon termination of the Period of Employment any and all such computers and electronic storage devices to the Company for complete inspection, data retrieval, and data removal. Employee shall not send any Confidential Information or Proprietary Information via web-based email (except through Quantlab's Outlook Web Access (OWA)). Employee shall not remove hard copies of documents containing Confidential Information or Proprietary Information from the Company's offices. Employee should consult Employer's procedures instituted to identify and protect Confidential Information and Proprietary Information, which are considered by Employer to be safeguards in addition to the protection provided by this Agreement. Nothing contained in those procedures or in this Agreement is intended to limit the effect of the other.

(i) CONFIDENTIAL RELATIONSHIP. Employee represents and warrants that from the time of his or her first contact with Employer, Employer has made Employee's execution of this Agreement (or a similar prior agreement that prohibits disclosure of Confidential Information and Proprietary Information) a condition of his or her employment and a prerequisite for access to any Confidential Information and Proprietary Information of the Company.

(j) THIRD-PARTY INFORMATION. Employee acknowledges that Employer has received and in the future will receive from third parties their confidential information subject to a duty on Employer's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Employee agrees that he or she owes Employer and such third parties, during the Period of Employment and thereafter, a duty to hold all such confidential information in the strictest confidence and not to disclose or use it, except as necessary to perform his or her obligations hereunder and as is consistent with Employer's agreements with such third parties.

(k) UNAUTHORIZED ACCESS. Employee's authorization to access company computers is limited as described above. In addition, Employee does not have authorization to access the Company's computers, computer network, email, databases, or other storage systems

(electronic or otherwise) when such access is undertaken: for purposes of personal gain except where the activity is in the course and scope of employment and also undertaken for the benefit of the Company; or, for purposes of assisting or benefiting a Competitor. Employee stipulates that unauthorized access to the Company's computer that violates the terms of access provided for in this Agreement will cause harm to the Company's computer system by, among other things, potentially compromising the integrity of the data and requiring a forensic investigation, and the attendant expenses, to confirm the integrity of the system, including potential corruption or sabotage thereof, and the integrity of the Company's confidential and proprietary data; and, Employee stipulates that this harm is real and intentional damage that causes material harm.

4. NON-COMPETITION AGREEMENT.

(a) PURPOSE. As an ancillary agreement to the otherwise enforceable confidentiality agreement contained elsewhere in this Agreement, and to further protect Confidential Information and goodwill of the Company, Employee agrees to the restrictions in this Section 4.

(b) DEFINITIONS.

(i) FINANCIAL MARKET MICROSTRUCTURE RESEARCH, DEVELOPMENT AND OPERATIONS ("FMMRDO"). For purposes of this Agreement, the term "FMMRDO" means and refers to researching, developing, operating or owning fully-automated trading strategies, models, modeling technology, operational programs, platforms, software, and/or algorithms, which are used for fully-automated trading on equity, bond, options, foreign exchange and futures markets around the world, or as may be modified, improved or expanded during the Period of Employment.

(ii) COMPETITOR. For purposes of this Agreement, "Competitor" includes all other entities that engage in FMMRDO that (1) research, develop, operate, own or intend to research, develop, operate or own (2) automated trading systems (3) that trade or intend to trade (a) on the same electronic market centers and (b) at the same frequencies or materially similar frequencies (4) that Employer either traded, was trading, was evaluating trading or was planning to trade during the final two years of Employee's Period of Employment.

(iii) THE SAME FREQUENCIES. At this time, "the same frequencies" refers primarily to high-frequency. In this context, "high-frequency" means and refers to strategies that more often than not result in buying and selling the same security on the same day. The Company anticipates that it may expand operations to include other frequencies.

(iv) MATERIALLY SIMILAR FREQUENCIES. Materially similar frequencies means and refers to frequencies that may be higher or lower than those to which the Company's models or strategies are currently applied but to which the Company's trading models or strategies could be profitably (even if not optimally) applied.

(c) LIMITATIONS ON WORK FOR COMPETITORS. For a period of **two (2) years** following termination of employment with the Company, Employee shall not without prior

written permission from Employer:

(i) directly or indirectly perform for, render advice to, or otherwise assist a Competitor in any position, job, task, function, or responsibility that is substantially similar to the positions, jobs, tasks, functions, or material responsibilities that Employee performed on behalf of the Company at any time during the final two (2) years of employment with the Company, or direct, supervise, or manage any such position, job, task, function, or responsibility; or

(ii) directly or indirectly (including as a consultant or independent contractor) accept employment with a Competitor in a position, or render consulting services to a Competitor relating to such subjects, that Confidential Information to which Employee had access during the Period of Employment would likely assist the Competitor.

(d) NOTICE TO EMPLOYER OF POTENTIAL WORK FOR COMPETITORS. If Employee intends to commence an employment or other service relationship during or within two (2) years following the Period of Employment, Employee shall give (i) any potential new employer or party notice of this Agreement; and (ii) the Company thirty (30) days advance notice prior to accepting such new employment or relationship. The failure to provide such notice may be used by a court or arbitrator to issue an order requiring Employee to pay the Company's attorneys fees and costs related to a legal action initiated by Company, regardless of which party is the prevailing party, because a significant purpose of this notice clause is to provide the Company with early communication in an effort to avoid litigation. Employee will have his or her right to express an opinion about the applicability of this Agreement to a prospective employer. Company will also have a legitimate business interest in expressing its opinion to a prospective employer of Employee regarding the application of this Agreement to Employee, and Employee will not assert any legal claim or cause of action based on the Company's communication of such an opinion without regard to whether this opinion is later found to be correct or not.

(e) NON-SOLICITATION OF CUSTOMERS. For a period of **two (2) years** following termination of employment with the Company, Employee will not, on behalf of a Competitor, call on, service, solicit, or accept competing business from customers of the Company or its Affiliates (i) with which Employee had or made contact, or (ii) about which Employee had access to Confidential Information, if such contact or access to Confidential Information occurred during the final two years of employment with the Company. These restrictions are limited by geography to the specific places, addresses, or locations where a customer is present and available for soliciting or servicing.

(f) NON-HIRE CLAUSE. For a period of **two (2) years** following termination of employment with the Company, Employee will not directly or indirectly, employ or participate in inducing or causing to be employed persons who were employees or service providers (*e.g.*, consultants or independent contractors) of Employer or any Affiliate at any time during the two (2) years immediately preceding the termination of the Period of Employment.

(g) NON-INTERFERENCE WITH EMPLOYEES AND SERVICE PROVIDERS. For a period of **two (2) years** following termination of employment with the Company, Employee will not interfere with Employer's business relationships with its employees and other service providers (e.g., consultants or independent contractors) by directly or indirectly, soliciting, inducing, or encouraging any such persons to terminate an existing business relationship with Employer or any Affiliate, or helping another person or entity engage in any such acts of interference.

(h) REASONABLENESS OF RESTRICTIONS. Employee acknowledges that the Company's business is global in nature and Employee's work will be used to support buying and selling activity on electronic market centers all over the world and so the most reasonable geographic limitation for the non-competition agreement is not where employee is physically located but rather where the Company's business is conducted—that is, the various market centers where the trades actually occur. Employee acknowledges and agrees that: (1) because modern technology allows Competitors offices to be physically located anywhere in the world, the definition of "Competitor" provides reasonable limits on the geographic reach of this Agreement; (2) the limitations on post-employment activities contained in this Agreement are no greater than necessary to protect the goodwill of the Company; (3) the post-employment restrictions of this Agreement are reasonable and necessary because the activities prohibited by Section 4 would likely result in the improper use or disclosure of non-public information about the Company's business, including Confidential Information and Proprietary Information, in breach of Section 3 of this Agreement and to Employer's detriment; (4) Employer conducts FMMRDO throughout world; (5) the services rendered by Employer to the Company are of a special and unique character; (6) FMMRDO is a niche business and there are far more quantitative research or development and technology research or development jobs for which Employee is qualified in other areas than there are within FMMRDO; (7) that the number of jobs in automated trading is merely a small subset of the number of jobs in quantitative trading; (8) the number of jobs in quantitative trading is a small subset of the number of jobs in quantitative finance for which Employee would be qualified; and (9) in light of the foregoing and of Employee's education, skills, abilities and financial resources, Employee acknowledges and agrees that Employee will not assert, and it should not be considered, that the enforcement of any of the covenants set forth in Section 4 would prevent Employee from earning a living, provide for his/her family or otherwise are void, voidable or unenforceable or should be voided or held unenforceable because the covenants may temporarily prevent employee from being involved in automated quantitative trading involving the same or materially similar frequencies.

5. INVENTIONS AGREEMENT.

(a) OWNERSHIP; ASSIGNMENT. Employee agrees that participating in and contributing to the Company's Intellectual Property (as defined below) is an essential part of Employee's employment with the Company. Employee does hereby grant and assign to Company or its nominee Employee's entire right, title, and interest in and to any lawfully assignable intellectual property, including, but not limited to, any Inventions, Works, patents, copyrights, trademarks, service marks, films, scripts, technologies, strategies, creations, improvements, and developments that Employee conceived, created, or reduced to practice, or caused to be conceived, created, or reduced to practice, alone or with others, during the Period

of Employment, that relate to the industry, trade, or business of the Company. All items covered by the foregoing shall be considered, and referred to herein as the "Company's Intellectual Property." The Company's Intellectual Property is understood to include, without limitation, not only items conceived, created or reduced to practice during Employee's employment but also (a) anything suggested by, or related to work performed by Employee or any other individual or entity engaged by the Company to perform services, (b) anything conceived or developed with the aid, assistance, or use of any of the Company's property, equipment, facilities, supplies, resources, or patents, trade secrets, copyrightable works, non-copyrightable works, know-how, technology, confidential information, ideas, trademarks, service marks, and any applications or registrations related to them, and (c) anything related to the past, current, or demonstrably anticipated business, research, or developments of the Company. All right, title, and interest of every kind and nature, moral or otherwise, whether now known or unknown, in and to any of the Company's Intellectual Property, including, but not limited to, any Inventions, Works, patents, trademarks, service marks, copyrights, films, scripts, ideas, creations, and properties invented, created, written, developed, furnished, produced, or disclosed by Employee, in the course of rendering services to Employer shall, as between Employer and Employee, be and remain the sole and exclusive property of Employer for any and all purposes and uses, and Employee shall retain no right, moral rights, title, power of control, or interest of any kind or nature in or to such property, or in or to any results or proceeds from such property. Employee acknowledges and agrees that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of his or her employment, are "works made for hire" as that term is defined in the United States Copyright Act (17 U.S.C. § 101) and that, as such, all rights comprising copyright under the United States Copyright laws will vest solely and exclusively in the Company and fall within the scope of Company's Intellectual Property as used here.

        (i)    For purposes of this Agreement, "Inventions" means inventions (whether patentable or not), discoveries, improvements, designs, processes, machines, or products, and innovative or useful concepts and ideas related to same, or related technologies or methodologies (whether or not shown or described in writing or reduced to practice).

        (ii)    For purposes of this Agreement, "Works" are: original works of authorship, whether created by Employee alone or with others, including, but not limited to: literary works (including all written material), computer programs, formulas, tests, notes, data compilations, databases, artistic and graphic works (including designs, graphs, drawings, blueprints, and other works), recordings, models, photographs, slides, motion pictures, and audio visual works, whether copyrightable or not, regardless of the form or manner in which documented or recorded; and, any trademarks, trade dress or names, symbols, special wording or devices used by Company or developed by Company employees to identify its business activities whether subject to trademark protection or not.

        (b)    HOLD-OVER CLAUSE. Employee agrees that for a period of one (1) year following the termination of Employee's employment with the Company, any Inventions or Works conceived, created, developed or reduced to practice by Employee, alone or with others, within a line of business that is the same as or substantially similar to any line of the Company's business that Employee participated in or received Confidential Information about in the two year period preceding the termination of Employee's employment shall be presumed to be an

Invention or Work derived from the Company's Confidential Information and trade secrets and/or Company's Intellectual Property; and, therefore, any such Invention or Work shall be an Invention or Work assigned to the Company. The foregoing presumption shall control unless (a) Employee provides the Company prompt notice of the Invention or Work within 30 days of its conception, discovery, or creation, and (b) Employee shows through clear and convincing evidence presented to the Company that the Invention or Work is unrelated to the Company's line of business and not derived in any manner, in whole or in part, from the Company's Confidential Information, trade secrets, or Intellectual Property.

(c) COOPERATION; APPOINTMENT AS AGENT. Employee agrees to assist Employer, at its expense, to obtain patents, copyrights, trademarks, service marks, and similar protections, for any such ideas, inventions, and other developments or improvements, and agrees to execute all documents necessary to obtain such protections in the name of Employer and/or its Affiliates. If Employer cannot secure Employee's signature upon any necessary documents to secure such protections, Employee hereby irrevocably designates and appoints Employer and its duly authorized officers and agents as Employee's agent and attorney-in-fact and authorizes Employer to execute and file any necessary documents.

(d) DISCLOSURE. To facilitate compliance with this agreement, Employee agrees that during employment with the Company and for a period of one (1) year thereafter Employee will immediately disclose to Employer all ideas, Inventions and Works made by Employee during the course of Employee's employment, or that are derived from or related to any work performed by Employee for the Company. An idea, Invention and Work is made by Employee during the course of Employee's employment if Employee conceived of, or put into practice, the idea during the Period of Employment.

6. MISCELLANEOUS

(a) TERMINATION OBLIGATIONS. Employee agrees that all property, including, without limitation, all equipment, tangible Proprietary Information, documents, books, records, reports, notes, contracts, lists, computer disks (and other computer-generated files and data), and copies thereof, created on any medium and furnished to, obtained by, or prepared by Employee in the course of or incident to his or her employment, belongs to Employer and shall be returned promptly to Employer upon termination of the Period of Employment. Employee's representations, warranties, and obligations contained in this Agreement shall survive the termination of the Period of Employment, and Employee's representations and warranties shall also survive the expiration of this Agreement. Following any termination of the Period of Employment, Employee shall fully cooperate with Employer in all matters relating to his or her continuing obligations under this Agreement.

(b) INTEGRATION. This Agreement is intended to be the final and complete agreement of the parties regarding the subject matter hereof, including but not limited to the use and disclosure of Confidential Information and Proprietary Information, non-competition, non-solicitation and inventions. Except to the extent that the enforcement a prior non-disclosure or non-competition covenant between Employer and Employee would provide greater protection to Employer, this Agreement is intended to supersede all other prior and contemporaneous

agreements and statements, whether written or oral, express or implied, on these subjects, and it may not be contradicted by evidence of any prior or contemporaneous statements or agreements. In the event that a prior non-disclosure or non-competition covenant provides greater protection to the Company, then the Parties agree that the Company may in its sole discretion elect to enforce one or more favorable covenants of the prior agreement instead of the conflicting covenant or covenants in this Agreement.

(c) SEVERABILITY, WAIVER, CHOICE OF LAW, AND VENUE. Employee will advise any future employer that is engaged in the business of trading securities or other financial instruments of the foregoing restrictions before accepting new employment. If any provision contained in this Agreement is determined to be void, illegal, or unenforceable, in whole or in part, then the other provisions contained herein shall remain in full force and effect as if the provision that was determined to be void, illegal, or unenforceable had not been contained herein, subject to the rights of reformation provided for by applicable law. The waiver by any party hereto of a breach of any provision of this Agreement, or selective enforcement as to others, shall not operate or be construed as a waiver of any subsequent breach by any party. The laws of the State of Texas shall govern this Agreement, the construction of its terms, and the interpretation of the rights and duties of the parties hereto, without regard to Texas choice of law rules. The Parties agree that Houston, Texas, shall be the exclusive place of proper venue for any legal proceeding involving a claim arising from this Agreement, and Employee consents to the personal jurisdiction of the courts (or arbitrator(s) if there is an enforceable arbitration agreement) in Harris County, Texas, over him or her.

(d) SURVIVAL, ASSIGNMENT, AND MODIFICATION. This Agreement shall inure to the benefit of the Company and its successors, assigns, parents, subsidiaries, divisions, and Affiliates, without need for any further action by the Company, and may be enforced by any one or more of same. Employee expressly agrees to the assignment of this Agreement in accordance with the foregoing. As a result, Employee will continue to be bound by the terms of this Agreement regardless of any promotions, demotions, or transfers that Employee may receive in the future. Otherwise, Employee's services under this Agreement are personal in nature and cannot be assigned without the Company's consent. This Agreement may not be modified, altered, or amended except by written agreement signed by Employee and the Company or as ordered by an arbitrator(s) or court of competent jurisdiction.

(e) WARRANTY AND INDEMNIFICATION. Employee warrants that Employee is not a party to any other restrictive agreement limiting Employee's activities for the Company. Employee further warrants that at the time of the signing of this Agreement, Employee knows of no written or oral contract or of any other impediment that would inhibit or prohibit employment with the Company and that Employee will not knowingly use any trade secret, confidential information, or other intellectual property right of any other party in the performance of Employee's duties for the Company. Employee shall hold the Company harmless from any and all suits and claims arising out of any breach of such restrictive agreement or contracts.

(f) CERTIFICATION. During the restriction periods enumerated herein, within five (5) days of any written or oral request by the Company, Employee must certify in writing that he or she has at all times fully complied with any and all of Employee's obligations under

the terms of this Agreement. If Employee fails or refuses to do so, an arbitrator(s) or court of competent jurisdiction may presume that Employee is in breach of the terms of this Agreement.

(g) INJUNCTIVE RELIEF. If Employee breaches or threatens to breach any provision of this Agreement, the parties acknowledge and agree that the damage or imminent damage to an Employer's business or its goodwill would be irreparable and extremely difficult to estimate, making any remedy at law or in damages inadequate. Accordingly, notwithstanding any agreement to arbitrate disputes, Employer shall be entitled to injunctive relief against Employee in the event of any breach or threatened breach of this agreement by Employee, in addition to any other relief (including damages) available to Employer. The restrictions upon Employee's activities set forth herein shall survive the termination of Employee's Period of Employment. Employee and the Company agree that in the event of a breach or threatened breach by Employee of any provision of this Agreement, the Company will not have an adequate remedy at law. In the event of breach or threatened breach by Employee of any provision of this Agreement, the Company shall be entitled to (i) injunctive relief by temporary restraining order, temporary injunction, and/or permanent injunction, (ii) recovery of the attorney's fees and costs incurred by the Company in obtaining such relief, and (iii) any other legal and equitable relief to which it may be entitled, including any and all monetary damages which the Company may incur as a result of said breach or threatened breach. Injunctive relief shall not be the exclusive relief and may be in addition to any other relief to which the Company would otherwise be entitled. One Thousand Dollars ($1,000.00) is the agreed amount for the bond to be posted if an injunction is sought by the Company. The availability to obtain injunctive relief will not prevent the Company from pursuing any other equitable or legal relief, including the recovery of damages from such breach or threatened breach. The existence of any cause of action by Employee against the Company shall not constitute a defense to enforcement of the restrictions on Employee created by this Agreement.

(h) TOLLING AND EQUITABLE EXTENSION. If Employee fails to comply with a timed restriction in this Agreement, the time period for that restriction will be extended. The time period will be extended so that Employer may receive the benefit of the bargain—a period wherein Employee acknowledges that s/he is bound by the restriction, refrains from threatening to violate and/or actually violating the restriction, and Employer is not in litigation to enforce the restriction. Accordingly, the parties agree that, to the extent allowed by law, the restriction shall be extended by the _greater_ of one (1) day for each day that the parties are in litigation over the restriction, up to a maximum of two (2) years, or one (1) day for each day Employee is found to have violated the restriction, up to a maximum of two (2) years.

(i) INTERPRETATION. This Agreement shall be construed as a whole, according to its fair meaning, and not in favor of or against any party. By way of example and not in limitation, this Agreement shall not be construed in favor of the party receiving a benefit nor against the party responsible for any particular language in this Agreement. Captions are used for reference purposes only and should be ignored in the interpretation of the Agreement.

(j) NOTICE TO THIRD PARTIES. Employee expressly authorizes Employer to notify third parties, including Employee's employers and potential employers, of the terms of this agreement.

Quantlab Financial, LLC, Employee Loyalty, Confidentiality, Inventions,
Non-Solicitation, and Non-Competition Agreement – Page 12
(Rev. 03/2010)                                                         Employee's Initials: DR

(k) EMPLOYEE ACKNOWLEDGMENT. Employee acknowledges that he or she has had the opportunity to consult legal counsel about this Agreement, has read and understands this Agreement, fully intends to comply with its terms, and has entered into it freely and voluntarily and based on his or her own judgment and not on any representations or promises by Employer (or any Affiliate or agent of Employer) other than those contained in this Agreement.

(l) CONSENT TO REFORMATION. In the event that the restrictions on Employee in this Agreement are unenforceable as written, then the parties agree and consent to the reformation of the agreement by the Court or Arbitrator(s) adjudicating the matter to make it enforceable to the maximum extent allowed by law in order to maintain protection of the Company's legitimate business interests.

(m) INCUMBENT EMPLOYEE'S SETTLEMENT OF RIGHTS. To the extent Employee began employment with the Company prior to the execution of this Agreement, Employee agrees that all Confidential Information and Proprietary Information, Inventions, and Works that Employee has received, created, or contributed to since beginning work for the Company are covered by this Agreement. Employee waives any and all claims to the contrary and agrees to assign all rights in same to the Company consistent with the remaining terms of this Agreement.

(n) LIMITATIONS OF THE REACH OF THIS AGREEMENT. Nothing in this Agreement is intended to modify the at-will nature of the employment relationship or, if the terms and conditions of Employee's employment are governed by a separate written employment agreement, then nothing herein is intended to modify the right of Employee or the Company to terminate the employment relationship as provided under that agreement. This Agreement shall not be construed to in any way limit or reduce the protections to the Company's intellectual property and trade secrets through application of laws (common law or statutory) that would apply absent this Agreement, or the obligations of Employee to the Company under the common law as its agent and fiduciary (as a person entrusted with confidential information).

7. ACCEPTED AND AGREED. By their signatures below, the parties indicate their intent to be immediately bound by the terms of this Agreement.

Employee

Signature: *David Reynolds* (signed)

Printed Name: DAVID REYNOLDS

Date signed: 10/04/11

Employer

**QUANTLAB** FINANCIAL, LLC

By: Bruce P. Eames (signed)
Its: Chief Executive Officer

Date signed: 10/26/11
Quantlab Financial, LLC, Employee Loyalty, Confidentiality, Inventions, Non-Solicitation, and Non-Competition Agreement – Page 14
(Rev. 03/2010)

Employee's Initials: DR